■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DARRYL WOODS, Appellant.—Appeal by the defendant from a

judgment of the County Court, Orange County (Pano Z. Patsalos, J.), rendered November 15, 1990, convicting him of robbery in the first degree and criminal possession of a weapon in the fourth degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of those branches of the defendant's omnibus motion which were to suppress physical evidence and statements made by him to law enforcement officials.

Ordered that the judgment is reversed, on the law and the facts, those branches of the defendant's omnibus motion which were to suppress physical evidence and his statements to law enforcement officials are granted, the indictment is dismissed, and the matter is remitted to the County Court, Orange County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.

We conclude that those branches of the defendant's omnibus motion which were to suppress physical evidence and his statements to law enforcement officials should have been granted in their entirety, as the police conduct exceeded permissible constitutional bounds. Since the evidence which connected the defendant with the crime must be suppressed, the indictment must be dismissed (see, People v Rossi, 80 NY2d 952).

At the defendant's suppression hearing, New York State Trooper Joseph Candela testified that he was on patrol on September 25, 1989, when he observed a blue 1978 Toyota, license number 7GL-300, with tinted windows, traveling in the opposite direction. At that time, he was aware that a small, blue vehicle with tinted windows had been seen several days earlier in the area where two hotel robberies had occurred and in the parking lot of a hotel when a larceny was discovered. Trooper Candela said he learned this information from a State Police investigator who "was curious as to the identity of the driver" of the vehicle. Upon observing the Toyota, Trooper Candela made a U-turn in order to follow it and was directly behind it when it stopped behind an unloading school bus. The defendant, who was driving the vehicle, exited, and approached the patrol car, while a passenger remained seated. The defendant said that he had observed the patrol car make a U-turn to follow him and asked Trooper Candela if he was going to pull him over. The defendant said that the State Police had stopped him earlier, perhaps because of his tinted windows or "[m]aybe they think I'm a drug dealer". The defendant showed Trooper Candela a New York State nondriver's picture identification card and identification from a store

where he worked as a security guard. Trooper Candela said he instructed the defendant to find a place to pull over by the side of the road where he could speak to him.

Trooper Candela testified that, at the point when the defendant approached the patrol car, there was nothing wrong with the Toyota except for the tinted windows. He had no reason to believe that either the defendant or his passenger had committed or were about to commit a crime.

The defendant parked the Toyota beside the road, and Trooper Candela asked for his license and registration. The defendant produced the registration and identification but did not produce a driver's license. Trooper Candela said that, because the defendant was employed as a security guard, he asked him if there were any weapons in the car. The defendant replied that he had a nightstick under the driver's seat. At Trooper Candela's request, the defendant stepped out of the car and retrieved the nightstick from underneath the seat. The defendant told Trooper Candela that he had a certificate for the nightstick but did not have the papers with him. Trooper Candela asked the defendant if he had any other weapons in the car. According to Trooper Candela, the defendant replied that he did not and offered to allow him to search the entire car. Trooper Candela testified that he then frisked the defendant and searched the driver's side and rear seat areas of the car. No contraband or weapons were found. Trooper Candela testified that the defendant then agreed to allow him to search the trunk and opened the trunk compartment for him. Trooper Candela found an army field jacket in the trunk and searched its pockets. He also observed a luggage case and asked the defendant what was inside of it. When the defendant replied that it was just clothing, Trooper Candela asked for permission to look inside. Although the defendant said the luggage would be hard to reach, he consented and crawled into the back seat in order to retrieve it. When the defendant handed him the luggage, Trooper Candela found that it was unzipped and contained only a flashlight, a T-shirt, and some wire.

Trooper Candela testified that he then frisked the passenger and searched the front passenger area and the glove compartment before again looking into the rear seat area. On the seat were an air rifle, a green cap, and a black cloth with two holes in it that had not been there earlier. In response to his questions, the defendant said that the air rifle was his and that he used it for dog training and target shooting. Trooper Candela told the defendant to get back in the car and called

the police station to ask for backup and to inform them that he had an armed robbery suspect. Trooper Candela said he was aware that there had been six hotel robberies in recent weeks in the area. The perpetrator had been described as a black male wearing an army jacket and a black face mask who carried a sawed-off rifle or shotgun.

After calling for backup, Trooper Candela said he advised the defendant that he was under arrest for criminal possession of a weapon in the fourth degree (the nightstick). The defendant was searched and placed in handcuffs. Trooper Candela advised the defendant of his *Miranda* rights in the patrol car, and he denied involvement in any robberies.

At the police station, the defendant signed a form consenting to the search of his vehicle on the highway and to an additional search of the vehicle at the police station. After his arrest, the defendant was interviewed by an investigator and gave a statement. He was issued summonses for driving without a license and for having excessively tinted windows in his vehicle.

The suppression court refused to suppress the physical evidence found in the Toyota and the defendant's statements to the police. The court determined that the defendant was not in custody until he was placed under arrest and that he consented to the search of his vehicle. Once the mask, army fatigue clothing, and air rifle were discovered, Trooper Candela had probable cause to arrest the defendant. The court determined that the defendant voluntarily waived his *Miranda* rights. After a trial, the defendant was convicted of robbery in the first degree in connection with the robbery of a restaurant and criminal possession of a weapon in the fourth degree (the nightstick).

We find that the defendant's motion to suppress the evidence found in his vehicle should have been granted. We reject the People's contention on appeal that the defendant's vehicle was not "stopped" by Trooper Candela. The police officer directed the defendant to pull over to the side of the road. The People were therefore required to establish that this stop was justified. The stop of a vehicle requires a showing that the police officer had a reasonable suspicion that its occupants had been, are then, or are about to be, engaged in conduct in violation of law *(see, People v Sobotker,* 43 NY2d 559, 563), or a showing that the officer observed a violation of the Vehicle and Traffic Law *(see, People v Erwin,* 42 NY2d 1064; *People v Petti,* 182 AD2d 720; *cf., People v Ingle,* 36 NY2d 413), as long as the traffic offense is not used as a

pretext to investigate the defendant on an unrelated matter *(see, e.g., People v Smith,* 181 AD2d 802; *People v Miret-Gonzalez,* 159 AD2d 647; *People v Llopis,* 125 AD2d 416; *see generally,* Kamins, New York Search & Seizure, Automobile Stops, ch V [A]).

Here the evidence established that Trooper Candela did not have information which would rise to the level of reasonable suspicion that the occupants of the Toyota were involved in criminal activity. That the defendant's vehicle matched a very general description of a vehicle seen several days previously in the area where robberies had occurred was insufficient *(see, e.g., People v Morrison,* 161 AD2d 608). Indeed, Trooper Candela acknowledged that he had no reason to believe that the occupants of the Toyota had committed a crime at the point when he directed the defendant to pull over to the side of the road.

We find that Trooper Candela's testimony presents a close question as to whether the defendant's vehicle was stopped for a traffic violation or whether the stop was merely a pretext to investigate the defendant in connection with the recent robberies. Trooper Candela's testimony suggested that he followed the defendant's vehicle in order to ascertain the driver's identity. However, Trooper Candela also testified that he noticed that the vehicle had tinted windows. The hearing court found that the Trooper followed the vehicle after noticing its tinted windows, and a summons was issued to the defendant for that violation *(see,* Vehicle and Traffic Law § 375 [12-a] [b]; *People v Osborne,* 158 AD2d 740 [traffic stop due to excessively tinted windows was proper]). Under the circumstances, we conclude that the stop was based on a traffic violation.

Although the stop was justified by the traffic violation, the intrusiveness of Trooper Candela's conduct exceeded that which is permissible during a normal traffic stop *(see, e.g., People v Mikel,* 152 AD2d 603). Trooper Candela had no justification for detaining the defendant to question him about matters unrelated to the traffic violation *(see, People v Class,* 67 NY2d 431; *People v Guzman,* 153 AD2d 320, *lv granted* 75 NY2d 926). Trooper Candela did not indicate that he observed any suspicious actions by the defendant or that he felt threatened in any way. That the defendant worked as a store security guard did not provide the necessary reasonable suspicion to detain and question him; therefore, the inquiry as to whether he had any weapons in the car was impermissible. Since the nightstick was recovered as the result of the imper-

missible detention and inquiry, it should have been suppressed.

Moreover, the other items recovered during the search of the defendant's vehicle should have been suppressed. A stop for a traffic offense will not justify a search of the motorist or of the vehicle unless there are reasonable grounds for believing the motorist guilty of a crime, as opposed to a traffic offense (see, People v Belton, 55 NY2d 49, 54; People v Marsh, 20 NY2d 98, 101; People v Class, supra, at 496), or if the officer, acting on reasonable suspicion that criminal activity is afoot, has an articulable basis to fear for his own safety (see, People v Torres, 74 NY2d 224). Even then, the officer may intrude upon the person or personal effects of the motorist only to the extent necessary to protect himself from harm (see, People v Torres, supra; People v Gonzalez, 155 AD2d 310). Here the Trooper had no reasonable suspicion that the defendant was involved in criminal activity nor did he express any basis to fear for his safety.

"A police officer's entry into a citizen's vehicle and his inspection of personal effects therein are significant invasions of privacy and such intrusions must be justified in their inception and be reasonably related in scope and intensity to the circumstances which rendered their initiation permissible" (People v Guzman, supra, at 322; see also, People v Torres, supra, at 230). We find that the level of police intrusion in this case was not reasonably related in scope and intensity to the circumstances which prompted the Trooper to stop the car in the first place.

We further conclude that the People failed to meet their burden of proving the voluntariness of the defendant's purported oral consent to the search of his vehicle, since it was the product of an improper detention and inquiry (see, People v Hollman, 79 NY2d 181; People v Gonzalez, 39 NY2d 122; People v Mikel, supra). Furthermore, the written consent obtained at the police station cannot retroactively validate the prior illegal police conduct (see, People v Thomas, 163 AD2d 438).

Finally, the statements obtained from the defendant at the police station were not sufficiently attenuated from his illegal arrest and must be suppressed (see, People v Conyers, 68 NY2d 982; People v Johnson, 66 NY2d 398; People v Milaski, 62 NY2d 147). Bracken, J. P., Eiber, O'Brien and Pizzuto, JJ., concur.