[644 NYS2d 178]

The People of the State of New York, Respondent, v Leonardo Turriago, Appellant.

First Department, June 6, 1996

APPEARANCES OF COUNSEL

*Mark Gimpel* of counsel, New York City *(E. Joshua Rosen-*

kranz, *Office of Appellate Defender;* and *Debevoise & Plimpton,* attorneys), for appellant.

*Penny Rosenberg* of counsel *(Diana Fabi Samson* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

### OPINION OF THE COURT

RUBIN, J.

This appeal presents a case in which the permission granted State Police to search a vehicle, found by Supreme Court to be consensual as a matter of fact, represents the product of official coercion as a matter of law. As the Court of Appeals stated in *People v Cantor* (36 NY2d 106, 112): "Street encounters between the patrolman and the average citizen bring into play the most subtle aspects of our constitutional guarantees. While the police should be accorded great latitude in dealing with those situations with which they are confronted it should not be at the expense of our most cherished and fundamental rights. To tolerate an abuse of the power to seize or arrest would be to abandon the law-abiding citizen to the police officer's whim or caprice—and this we must not do. Whenever a street encounter amounts to a seizure it must pass constitutional muster." In order to uphold the constitutionality of the search undertaken in this matter, this Court would be required to ignore clear pronouncements of the high courts of this State and the United States.

As found by Supreme Court, Criminal Term, in its ruling on defendant's suppression motion, at approximately 2 o'clock on the morning of November 20, 1990, New York State Troopers John O'Leary and James Van Cura were parked in their troop car on Route 17, about three fourths of a mile west of the Woodbury Toll Plaza. After observing a westbound U-Haul van that appeared to be speeding, the State Troopers followed, pacing the vehicle, and ascertained that it was travelling at 70 miles per hour on a highway where the speed limit is 55 miles per hour. They activated their emergency lights and pulled the van over. Trooper O'Leary approached on the driver's side and Trooper Van Cura on the passenger's side.

Defendant Leonardo Turriago was driving, and codefendants Dennis Torres and Edwin Sepulveda were seated next to him.* Trooper O'Leary advised defendant that he had been stopped for speeding and inquired in regard to his origin and destination. Defendant stated that he was traveling from New York City to Binghamton. When requested, defendant produced his

---

* Edwin Sepulveda entered a guilty plea to manslaughter in the first degree and was sentenced to three and one-third to ten years' incarceration. Dennis Torres pled guilty to hindering prosecution and was sentenced to time served.

driver's license and the rental agreement for the van, signed by him.

The State Troopers testified that the previous day was the first day of deer hunting season, bringing an influx of vehicles from New York City, some carrying loaded hunting weapons as well as animals taken in violation of hunting regulations. Trooper Van Cura had participated in a number of patrols in conjunction with the Department of Environmental Conservation for the purpose of detecting these unlawful weapons and animals. He testified that the procedure employed is to stop vehicles, either through a roadblock or roving patrol, and ask the occupants for consent to search the vehicle, conducting a search if consent is granted, but refraining if consent is denied unless there is some indication of criminal activity. It is not disputed, however, that early on that November morning, the assignment was, as Trooper O'Leary testified, "Regular road patrol." The Troopers had just completed responding to the scene of an accident and were about to have some coffee when the speeding U-Haul van came into sight.

After receiving the driver's papers from defendant, Trooper O'Leary asked what defendant had in the cargo area of the van. Defendant replied that it contained clothing and construction equipment he was moving for his father. On cross-examination, the Trooper explained, "During hunting season, we have problems with people hunting deer at night without licenses, carrying loaded weapons in their car, [or] van, just curious what they had in the back." He testified that he made his request to inspect the cargo area of the van within approximately two minutes of stopping the vehicle. Trooper O'Leary stated that, on the way to the back of the van, "I just patted his pockets, made sure he didn't have any weapons on him." Defendant rolled up the cargo door and entered the back of the vehicle, accompanied by Trooper Van Cura. Trooper O'Leary then proceeded to the passenger side to talk with Sepulveda and Torres.

In the cargo area of the vehicle, Van Cura saw a cardboard box, a tool box, a steamer trunk and several other items. He asked defendant what the cardboard box contained and was informed that it held clothing and construction equipment. Van Cura then asked defendant if he would open the box, defendant obliged, and the Trooper saw that the box contained pillow cases, clothing and a hammer. Van Cura then inquired about the contents of the trunk and was told by defendant that it contained more clothing. Van Cura asked if he would mind

opening the trunk, and defendant replied "sure" but stated he would have to use a key to open the latches.

At first, defendant appeared to be having difficulty opening the trunk, stating that he thought the lock might be broken. After suggesting that defendant keep trying, the Trooper heard the lock click open, at which point defendant ran away from the vehicle. As Trooper Van Cura released the latch, the lid opened and human legs protruded from the trunk, revealing the body of the victim, Fernando Cuervo.

Defendant was apprehended after a brief chase. The three men were read their *Miranda* rights, arrested and transported to the State Police barracks at Monroe. Only then did Trooper O'Leary issue defendant summonses for speeding and failing to wear a seat belt. Trooper Van Cura ran a computer check of defendant's license, which revealed that it was suspended, for which he issued defendant a summons for aggravated operation of a motor vehicle without a license pursuant to Vehicle and Traffic Law § 511 (1) (a). Department of Motor Vehicle records further disclosed that none of the three men possessed a valid driver's license.

Based on statements made by defendant and his companions on the morning of their apprehension, warrants were obtained for the apartment where the murder had been committed and for another apartment used by defendant Turriago as his residence. In the course of the searches, police recovered 11 pounds of cocaine, three loaded firearms, a box of .25 calibre ammunition, bullet casings, cellophane and duct tape of the type with which the body of the victim was wrapped, and blood samples. A police scuba team recovered a .25 calibre handgun from the Hudson River at 125th Street, the location where defendant admitted he disposed of the weapon. Defendant stated that he had killed Fernando Cuervo over a "drug thing" by shooting him in the face with a .25 calibre Raven firearm and then striking him in the head with a hammer. An autopsy confirmed that the injuries described were the cause of death and that the hammer, which was recovered from the rented van and from which defendant's palm print was lifted, was consistent with the fractures to the victim's skull.

With the exception of some inculpatory statements made by defendant at the end of questioning after he had invoked his right to counsel, Supreme Court denied his motion to suppress the physical evidence and his statements to police. The court found that the State Troopers had the right to make initial inquiries after stopping the van for speeding. It ruled that

"suspicion based upon the onset of the hunting season, the nature and speed of the vehicle and the hour" justified the State Troopers' request for consent "to inspect the vehicle and its contents." While noting that no consent to search form was obtained and that defendant was never advised that he could refuse to consent to the search, the court concluded that, under the totality of the circumstances, defendant's consent was freely given and was neither the product of police coercion nor a mere submission to authority.

On appeal, defendant does not contest the sufficiency of the overwhelming evidence supporting his conviction. He contends only that the State Troopers had no right to ask him for consent to search the rental van, rendering the search involuntary and requiring suppression of all evidence and statements that followed from the illegal search.

At issue on this appeal is not whether, as Supreme Court found, defendant freely consented to the search of the rental van, but whether the State Troopers were justified in asking for his consent under the circumstances. Defendant's confession and the strength of the physical evidence connecting him to the murder notwithstanding, this Court is constrained by the Court of Appeals rulings in *People v Hollman* (79 NY2d 181) and *People v Banks* (85 NY2d 558, *cert denied* — US —, 116 S Ct 187) to hold that the search violated defendant's rights under New York Constitution, article I, § 12 (*People v Harris*, 77 NY2d 434). Suppression of the evidence that emanated therefrom, including defendant's statements to the New York State Troopers, is required pursuant to the United States Supreme Court's decision in *Wong Sun v United States* (371 US 471) as fruit of the poisonous tree (*People v Gethers*, 86 NY2d 159; *People v Harris, supra*).

The Troopers had a sound basis upon which to stop the vehicle in order to issue a speeding ticket to the operator (*People v Ingle*, 36 NY2d 413, 415-416). However, they neither issued a summons nor even verified the license and registration of the vehicle defendant had rented before obtaining his consent to search it (*People v Banks, supra*, at 561). While the initial inquiry into defendant's origin and destination was within the bounds of a request for information (*People v Hollman, supra*, at 194; *People v De Bour*, 40 NY2d 210, 218-219), nothing transpired to justify suspicion that criminal activity was afoot so as to give rise to the common-law right to inquire (*People v De Bour, supra*, at 215) and justify the request to search (*People v Hollman, supra*, at 195).

The testimony given by the State Troopers who apprehended defendant and his companions was extremely forthright, and there is no reason to disturb the findings of fact made by Supreme Court. It is understatement to remark that the Troopers perceived defendant to be most cooperative. This Court is completely satisfied that Supreme Court properly accorded full credit to the testimony of Trooper Van Cura that he was acting to carry out the mandate of the Environmental Conservation Law to enforce the provisions of article 11 governing the hunting of deer and other wildlife (ECL 71-0525 [1]). However, it is notable that the Trooper did not observe any weapons, blood, gun racks, rifle or shotgun cases, other hunting implements or clothing which might suggest that the occupants of the rental van were engaged in illegal hunting (compare, People v Tejeda, 217 AD2d 932, lv denied 87 NY2d 908 [illogical and suspicious responses to initial inquiries]; People v Carter, 199 AD2d 817, affd 86 NY2d 721 [obviously false response to initial request for information]; People v Sora, 176 AD2d 1172, lv denied 79 NY2d 864 [speeding vehicle matched description, location and destination of anonymous tip]). He merely stated that it was his practice to request permission to search a vehicle in connection with environmental control enforcement efforts. Neither can People v Battaglia (86 NY2d 755), relied upon by the dissenter, be read to support the search in this case. There, a divided Court (4-3) merely declined to review, as beyond its limited jurisdiction, the ruling of the Appellate Division, Fourth Department (citing Matter of Gissette Angela P., 80 NY2d 863, 864). The dissent (Smith, J.) concluded that the search was not supported by the requisite founded suspicion of criminal activity (People v Battaglia, supra, at 758).

The Environmental Conservation Law gives State Troopers the authority to "search without search warrant any boat or vehicle of any kind * * * whenever they have cause to believe that any provision of this article or of any law for the protection of fish, shellfish, crustacea, wildlife, game or protected insects has been or is being violated, and to use such force as may be necessary for the purpose of examination or search" (ECL 71-0525 [1] [b]). However, it is not contended that the search in this case was conducted as part of "some nonarbitrary, systematic procedure to verify compliance with the law", such as "by uniform inspection of all vehicles at a roadblock or checkpoint" (People v Ingle, supra, at 416; People v John BB., 56 NY2d 482, 487-488, cert denied 459 US 1010). Furthermore,

the statutory requirement that the officer have "cause to believe" that a provision of the law is being violated implicates the same standard enunciated in *People v De Bour* (*supra*, at 215) that there exist a founded suspicion of criminality activating the common-law right to inquire (*People v Hollman, supra*, at 191-192). Stated another way, just because a law enforcement official is acting pursuant to the Environmental Conservation Law does not exempt any search that he might conduct from the operation of the Fourth Amendment, as interpreted by *People v De Bour* and its progeny.

As explained by the Court of Appeals in *People v Gonzalez* (39 NY2d 122, 124), "Consent to search, a relinquishment of constitutional protection under both the Federal and State Constitutions against unjustified official intrusion, must be a free and unconstrained choice. Official coercion, even if deviously subtle, nullifies apparent consent." As the United States Supreme Court stated the principle in *Bumper v North Carolina* (391 US 543, 550), "Where there is coercion there cannot be consent."

Supreme Court's conclusion that "[t]here was no suggestion of intimidation or coercion in the troopers' behavior up until the body was discovered" is contradicted by the evidence of record. As an initial consideration, the detention of defendant and his companions for a legitimate traffic infraction constitutes a limited seizure subject to constitutional constraints (*People v Ingle, supra*, at 418). Defendant could not reasonably " 'disregard the police and go about his business' " (*Florida v Bostick*, 501 US 429, 434, quoting *California v Hodari D.*, 499 US 621, 628). Thus, the encounter cannot be said to be consensual, and reasonable suspicion of illegality is required to justify a search (*supra*).

The level of intrusion upon defendant's freedom of movement is exemplified by Trooper O'Leary's pat down, which cannot be justified under the standards enunciated in *People v De Bour* (*supra*). Even if it could be said that the attendant circumstances warranted more than a mere informational inquiry, it is well settled that "the right to request information as delineated in *De Bour* (*supra*) and the common-law right to inquire do not extend to a frisk" (*People v De Bour, supra*, at 223). The authority to frisk is incidental to the right conferred by CPL 140.50 to forcibly stop and temporarily detain for questioning a person reasonably suspected of committing a crime, and it requires that the officer entertain a reasonable suspicion that his physical safety is in danger (*supra*, at 223;

*People v Brandon*, 149 AD2d 907, 908, *lv denied* 74 NY2d 736; *see, People v Mikel*, 152 AD2d 603). Neither of these criteria is established by the record in.this case. Defendant's explanation of his journey did not arouse any suspicion so as to confer the common-law right to inquire; a fortiori, there was no ground for reasonable suspicion of his involvement in a crime (*see, People v Dugan*, — AD2d —, —, 1995 NY Slip Op 10943 [3d Dept, Dec. 7, 1995]). Nor did either of the State Troopers express any concern for his physical safety (*supra*). Nevertheless, Trooper O'Leary's pat down of defendant indicates, quite plainly, that defendant was treated by the Troopers as though he were being detained (*People v Milaski*, 62 NY2d 147, 155-156, n 3) and not merely being subjected to a request for information or common-law inquiry.

Finally, there is no merit to the People's bootstrap argument that, irrespective of the lack of legal predicate for the search of the vehicle, the body of Fernando Cuervo would inevitably have been discovered (*People v De Bour, supra*, at 215-216). It is the People's contention that the police were bound to learn, as ultimately they did, that none of the three men had a valid operator's permit to drive the van. Therefore, they assert, the vehicle was required to have been impounded (Vehicle and Traffic Law § 511-b) and would have been subject to an inventory search. Overlooking, for the time being, the infirmity of this reasoning, it must be emphasized that, while the State Troopers properly obtained the vehicle registration and the operator's license (Vehicle and Traffic Law § 401 [4]; § 507 [2]), the record indicates that they made no attempt to verify the documentation before proceeding to seek defendant's permission to search it (*People v Banks, supra*, at 561). This sequence of events only lends further support to the conclusion that the search "was the product of an inseparable illegal detention" (*supra*, at 561).

In any event, the law on this subject is settled. "The doctrine of inevitable discovery may not be used to excuse unlawful police actions by admitting what was obtained as a direct result of the misconduct" (*People v Burr*, 70 NY2d 354, 360, n 3 [citing *People v Stith*, 69 NY2d 313, 319], *cert denied* 485 US 989; *People v Solano*, 148 AD2d 761, 763). The inevitable discovery theory propounded by the People is exactly the one rejected in *People v Stith*, a case involving remarkably similar circumstances, in which the Court of Appeals observed (*supra*, at 319):

"The courts below simply assumed the chain of events which would customarily have been set in motion following defen-

dant Newton's failure to produce a registration certificate: that a radio check would have revealed that the truck was stolen, defendants would have been arrested, the truck would have been impounded and the gun would have been found in an inventory search.

"We hold that applying the inevitable discovery rule in these circumstances, and effecting what would amount to a *post hoc* rationalization of the initial wrong (*see, Nix v Williams* [467 US 431], at 448), would be an unacceptable dilution of the exclusionary rule."

Logically, the subsequent discovery that none of the persons in the rental van was authorized to operate the vehicle cannot serve as a predicate to the request to search (*People v Hollman, supra,* at 191-192; *People v De Bour, supra,* at 222; *People v Boyd,* 188 AD2d 239, 243). As the Court of Appeals stated in *People v Banks* (*supra,* at 562), "A traffic stop constitutes a limited seizure of the person of each occupant (*People v May,* 81 NY2d 725, 727; *People v Harrison,* 57 NY2d 470, 476). For a traffic stop to pass constitutional muster, the officer's action in stopping the vehicle must be justified at its inception and the seizure must be reasonably related in scope, including its length, to the circumstances which justified the detention in the first instance". While, as in *Banks,* the traffic stop was justified, the "circumstances of the detention were not. Consequently, the evidence ultimately seized must be suppressed" (*supra,* at 562; *People v Woods,* 189 AD2d 838, 842; *People v Mikel, supra*). The inevitable discovery rule cannot be applied to any evidence recovered from the U-Haul van because the Court of Appeals "has never applied the rule where, as here, the evidence sought to be suppressed is the very evidence obtained in the illegal search" (*People v Stith, supra,* at 318; *People v Grovner,* 172 AD2d 1035).

The People nevertheless argue, in conclusory and perfunctory fashion, that "secondary" evidence is admissible under the inevitable discovery rule, that is, "evidence obtained indirectly as a result of leads or information gained from th[e] primary evidence" (*People v Stith, supra,* at 318). Without elaboration, the People contend that the secondary evidence in this case is comprised of defendant's statements; the murder weapon; the bullets, shell casings, duct tape, plastic wrap and blood samples taken from defendant's apartments; the autopsy findings; and the testimony of Fernando Cuervo's wife.

The two cases relied upon to support the inevitable discovery theory both involve evidence which might have been obtained

by canvassing dealers in the particular items sought to be admitted into evidence (*People v Payton*, 45 NY2d 300, 313-314, *revd on other grounds* 445 US 573, *on remand* 51 NY2d 169 [rifle shell casing]; *People v Watson*, 188 AD2d 501, 502 [ring]). In *Watson (supra,* at 502), routine police procedures included "a well established system of checks on local establishments which bought and sold silver and gold items" that would inevitably have resulted in the discovery of the victim's antique engagement ring. In *Payton*, the procedure was not "well established" (it was apparently unprecedented) and would have required canvassing approximately half of the registered gun dealers in the State, prompting the dissent to suggest that the discovery of the dealer who sold the murder weapon was far from "inevitable" (45 NY2d, *supra,* at 316-317 [Wachtler, J., dissenting]). Be that as it may, there is no suggestion in the case before us that the police routinely drag the East River for evidence or that such a procedure would be likely to lead to the recovery of a handgun (*cf., People v Dempsey*, 177 AD2d 1018, *lv denied* 79 NY2d 946 [grid search in vicinity of apprehension]).

Defendant's statements, made within six hours of his arrest, were not sufficiently attenuated from the illegal search by reason of "the temporal proximity of the arrest and the statement[s], the absence of intervening circumstances and the purpose * * * of the police misconduct" (*People v Harris, supra,* at 441). The State Troopers' testimony that, while not assigned to an environmental control detail on the night in question, their search of defendant's vehicle was made in furtherance of the protection of wildlife is quite plausible. In particular, Trooper O'Leary's testimony that he sought defendant's permission to conduct the search because he was "[j]ust curious, basically" is remarkably candid. However, "attenuation is not established by showing that the police conduct was undertaken in good faith" (*People v Harris*, 72 NY2d 614, 622 [citing *Taylor v Alabama*, 457 US 687], *reversed* 495 US 14, *on remand* 77 NY2d 434, *supra*; 4 LaFave, Search and Seizure § 11.4 [b], at 397-398 [2d ed]). "An otherwise inadmissible confession may not be admitted into evidence simply because there has been no showing of purposeful misconduct" (*supra,* at 622). Moreover, idle curiosity does not remotely rise to the level of reasonable suspicion of criminality required to justify the encroachment upon defendant's privacy interest in the vehicle (*People v Banks, supra,* at 561-562 [lessee has dominion and control over vehicle and, therefore, a privacy interest]). As

stated in *People v De Bour* (*supra*, at 217): "The basic purpose of the constitutional protections against unlawful searches and seizures is to safeguard the privacy and security of each and every person against all arbitrary intrusions by government. Therefore, any time an intrusion on the security and privacy of the individual is undertaken with intent to harass or is based upon mere whim, caprice or idle curiosity, the spirit of the Constitution has been violated and the aggrieved party may invoke the exclusionary rule or appropriate forms of civil redress."

Whatever may have been the motivation, the unauthorized search was clearly undertaken to obtain physical evidence and, thus, has "the 'quality of purposefulness' to uncover incriminating evidence" (*People v Boodle*, 47 NY2d 398, 404 [quoting *Brown v Illinois*, 422 US 590, 605], *cert denied* 444 US 969). Defendant's confession followed within hours, and interrogation was uninterrupted by sleep, meals or contact with family or counsel. The People have not sustained their obligation "to demonstrate that the statements were acquired by means sufficiently distinguishable from the arrest to be purged of the illegality" (*People v Conyers*, 68 NY2d 982, 983) and point to no intervening events that would break the causal connection between the police misconduct and the statements (*People v Johnson*, 66 NY2d 398, 407-408). And if the statements are inadmissible, the evidence recovered upon the execution of warrants acquired on information obtained from the statements made by defendant and his companions is likewise inadmissible, unless discovery is supported by independent grounds. The People have not met their burden to establish an independent basis for the discovery of otherwise tainted evidence (*see, People v Fitzpatrick*, 32 NY2d 499, 507). The derivative incriminating evidence, discovered as the byproduct of information supplied to police by defendant in his statements, cannot therefore be considered the result of a source unrelated to the official misconduct but must be regarded as a direct consequence of the unlawful search (*People v Parris*, 136 AD2d 882, 883, *lv denied* 71 NY2d 1031).

The remaining secondary evidence is of limited value. The testimony of the victim's wife does not connect defendant to the murder. Nor is the medical evidence, assuming its admissibility, sufficient to connect defendant to the crime in the absence of the physical evidence subject to suppression.

In light of suggestions that New York State adopt the Federal approach to search and seizure questions, it is ap-

propriate to note that the result in this matter would be no different if analyzed from the Federal perspective. Similarly, justification for a frisk requires an "articulable suspicion that a person has committed or is about to commit a crime" (*Florida v Royer*, 460 US 491, 498, citing *Terry v Ohio*, 392 US 1). As illustrated by *Florida v Bostick* (*supra*) and *Florida v Royer* (*supra*), to constitute a consensual search, permission must be granted under circumstances in which the person subject to official scrutiny has not been placed under detention, even momentarily, unless the police can demonstrate reasonable objective grounds for the detention (*Florida v Royer*, *supra*, at 497; *see, United States v Mendenhall*, 446 US 544). As these criteria are not satisfied under the facts of this case, the search of defendant's vehicle is likewise unconstitutional under Federal guidelines.

The scope of the constitutional problem is not immediately apparent from the circumstances of this particular case, in which a State Trooper's intuition seems to have been rewarded and, *post hoc ergo propter hoc*, justified (although what he uncovered is hardly what he professed to be looking for). The constitutional ramifications are, however, much broader. When a motorist, stopped for some minor traffic infraction on a lonely stretch of road in the dead of night, is approached by two imposing State Troopers—the very personification of State authority on the highway—one of whom leans over the car and asks, "Mind if we look in the trunk?", can the forthcoming affirmative response truly be regarded as the product of free will? The courts have confronted this problem for some 35 years, and the detailed criteria which have been formulated to balance the government's legitimate interest in law enforcement against the encroachment upon the individual's right to privacy and freedom of movement should not be lightly disregarded. The fruits of the search of a detainee, undertaken without founded suspicion of criminal activity, are required to be suppressed under either the State or Federal Constitution.

Finally, it is appropriate to emphasize that what is fundamentally at issue in this case is the extent to which constitutional liberties can and should be compromised for the sake of more effective law enforcement. It might appear tempting to adopt, as the Trial Justice did, the rationale advanced by the People in this case—that the search of defendant's van is justified by a vague "suspicion based upon the onset of the hunting season, the nature and speed of the vehicle and the hour". While, to some, this may seem acceptable in order to more ef-

fectively wage the war on crime, the courts have made a reasoned determination that the occasional loss of the opportunity for apprehension is outweighed by the need to preserve the freedom of movement of the general populace by requiring the police to demonstrate reasonable suspicion of criminal activity before infringing upon an individual's liberty (*see, People v Spencer*, 84 NY2d 749, 759, *cert denied* — US —, 116 S Ct 271; *People v Elam*, 179 AD2d 229, 233-234 [Murphy, P. J.], *appeal dismissed* 80 NY2d 958).

Accordingly, the judgment of the Supreme Court, New York County (Rena Uviller, J.), rendered December 19, 1991, should be reversed, on the law, the motion to suppress physical evidence and defendant's statements granted, and the matter remanded to Supreme Court for further proceedings.

SULLIVAN, J. (concurring). I believe that the result reached in this case is compelled by the Court of Appeals decision in *People v Hollman* (79 NY2d 181, 191-192, 194). While the initial stop was proper and provided a basis for a request for general information, e.g., license and registration and destination, there were no facts or circumstances which justified the Trooper's request to "see what's in the back of the truck." At that point, under *Hollman*, the encounter became a common-law inquiry, which must be supported by a founded suspicion that criminality is afoot. (*Supra*, at 191-192, 194; *see also, People v Tejeda*, 217 AD2d 932, 933, *lv denied* 87 NY2d 908 ["An officer's request for consent to search a stopped vehicle must * * * be justified by a founded suspicion that criminal activity is afoot."].) Completely absent here are any observations by the Troopers or any other facts which would provide them with a reason to suspect that the individuals had engaged in criminal conduct. None of the circumstances upon which the dissent relies—the occurrence of the stop on the first night of the hunting season, the early morning hour, the speed of the vehicle, the facts that its occupants were from New York City and that the same type of vehicle is sometimes used by hunters to transport illegal firearms and game—nor any combination thereof, justified such a suspicion. Since a founded suspicion that criminality was afoot was lacking, the inquiry which yielded defendant's consent was improper and the court erred in upholding the search on this ground. (*See, People v Hollman, supra*, at 194.)

Tom, J. (dissenting). I respectfully dissent and vote to affirm the trial court.

Defendant appeals a judgment convicting him of, *inter alia*, murder in the second degree, on the ground that physical evidence, including a dead body found in the back of a U-Haul truck, should have been suppressed because the police search of the vehicle was not consensual.

Testimony educed at the suppression hearing and at the jury trial of this action reveals that at approximately 1:00 P.M. on November 19, 1990, defendant Leonardo Turriago, after a brief struggle in his apartment, killed Fernando Cuervo by shooting him five times in the head and, according to defendant's statements, after he would not die, striking him with at least three more blows in the head with a hammer. Defendant and codefendant Edwin Sepulveda subsequently wrapped Cuervo's body in cellophane and duct tape and put it inside a steamer trunk. At approximately 3:45 P.M. that same afternoon, defendant confided to codefendant Dennis Torres that he had a body he did not know what to do with.

Defendant and Torres then went to 133rd Street, where defendant rented a U-Haul truck, after which the two men split up. That same evening, defendant and Sepulveda picked up Torres at his home and returned to Turriago's apartment, where Torres and defendant loaded the truck with the trunk containing Cuervo's body, a cardboard box, a ladder and a tool box. Thereafter, the three men drove to 125th Street, where defendant exited the vehicle and threw the gun he used to shoot Cuervo into the Hudson River. Defendant then got back into the driver's seat and proceeded upstate, where they planned to burn and dispose of the body.

At approximately 2:00 A.M. on the morning of November 20, 1990, New York State Troopers James Van Cura and John O'Leary were on routine patrol and were sitting in their marked patrol car about three quarters of a mile west of the Woodbury toll booths in the Village of Harriman, New York. The day before, November 19, 1990, was the first day of hunting season and Trooper Van Cura had just finished working an Environmental Conservation Department road check.

Troopers working the environmental detail have the authority, *inter alia*, to stop vehicles, question the occupants and, where they have cause to believe that the Environmental Conservation Law has been violated, can search the automobile without a warrant (ECL 71-0525 [1] [b])[1]. Trooper Van Cura testified that they do not have authority to search the vehicles

---

1.  ECL 71-0525 (1) (b) provides, in pertinent part:

if the occupants deny the Troopers permission to do so and no probable cause exists.

On the morning of November 20, 1990, the Troopers observed a U-Haul truck, being driven at a high rate of speed, proceeding west on Route 17 toward Binghamton, New York. The Troopers paced the truck, driven by defendant, and determined that it was moving at a rate of 70 miles per hour in a 55-miles-per-hour speed zone.

The Troopers signaled the truck to stop by activating the car's emergency lights and pulled defendant's vehicle to the right shoulder of the road. Trooper O'Leary approached the truck on the driver's side and Trooper Van Cura approached on the passenger side. Trooper O'Leary requested defendant's license and registration, and received his license and the rental agreement for the truck. Trooper O'Leary then asked defendant what he had in the back of the truck. On cross-examination, when Trooper O'Leary was presented with the question as to what prompted him to ask what was in the car, he replied that "[d]uring hunting season, we have problems with people hunting deer at night without licenses, carrying loaded weapons in their car, a van, just curious what they had in the back".

In response to the Trooper's question, defendant replied that he was transporting his father's construction equipment and some clothing. Trooper O'Leary then asked defendant "Do you mind if we see what's in the back of the truck?", to which defendant replied "Sure. I'll show you." Defendant then exited his vehicle without prompting, at which time Trooper O'Leary patted his pockets to ascertain whether he had any weapons.

The two Troopers, along with the defendant, proceeded to the back of the truck. Trooper Van Cura who, as noted previously, had just come from an environmental control road detail, testified that he was concerned that defendant might be transporting loaded rifles when he also inquired of defendant if the Troopers could look in the back of the truck. Again, the de-

"All police officers * * * shall enforce the provisions of this chapter * * * or of judgments obtained for violation thereof, and shall have, particularly, the following powers:

"To search without search warrant any boat or vehicle of any kind, any box, locker, basket, creel, crate, game bag, package or any container of any nature and the contents of any building other than a dwelling whenever they have cause to believe that any provision of this article or of any law for the protection of fish, shellfish, crustacea, wildlife, game or protected insects has been or is being violated, and to use such force as may be necessary for the purpose of examination and search".

fendant replied "sure, no problem" without hesitation and began to open the cargo bay of the truck.

Inside the bed of the truck, the Troopers observed a steamer trunk and a cardboard box, among other items. Trooper O'Leary proceeded to the front of the truck to talk to the other passengers while Trooper Van Cura entered the back of the truck. Trooper Van Cura stated that he asked defendant what was inside the cardboard box, to which defendant responded that it contained construction equipment and clothes. The Trooper asked if defendant would mind opening the box and defendant replied, "sure, no problem". Defendant then opened the box and displayed pillow cases, clothes and a hammer that were contained therein.

Trooper Van Cura testified that he then asked defendant what was in the trunk, and defendant told him that it contained more clothes. Trooper Van Cura asked if defendant would mind opening the trunk, to which defendant eagerly replied "sure". Upon attempting to unlock the trunk and fumbling with the mechanism, the defendant told the trooper that he believed the lock was broken. Trooper Van Cura suggested that defendant continue to try and open the lock but "if its broken, then its broken." Unfortunately for defendant, immediately thereafter there was an audible click indicating the lock had opened, at which point defendant promptly alighted from the truck and began to run.

Trooper Van Cura then unlatched the last latch and the trunk popped open, revealing the bloody body wrapped in plastic and duct tape. Trooper Van Cura exited and proceeded to chase defendant, who had slowed down near the front of the truck in order to warn the passengers to run. Trooper O'Leary secured Torres and Sepulveda on the ground outside the truck while Trooper Van Cura pursued defendant westbound, on foot, along the shoulder of Route 17, into some thick brush. After a short chase, defendant was tackled by the Trooper, handcuffed, and returned to the truck, where the Troopers called for assistance. Trooper Van Cura then read defendants their *Miranda* rights while awaiting the arrival of a sergeant and Bureau of Criminal Investigation team. Once the backup arrived, the three men were transported to the New York State Police barracks in Monroe, New York.

Upon reaching the barracks, Trooper O'Leary issued defendant summonses for speeding and for failing to wear a seat belt and, after checking the status of his driver's license, a third summons for aggravated unlicensed operation of a vehi-

cle. Defendant was again read his rights by Trooper Terry Curtis, after which defendant agreed to talk to the Trooper.

Based upon subsequent statements made by defendant, as well as those of Sepulveda and Torres, search warrants were obtained for the apartment where the murder had been committed and for another apartment used by defendant as his residence. The ensuing searches recovered, among other things, two .25 calibre shell casings, duct tape, plastic wrap, blood samples from a living room wall, two beepers, five kilograms (approximately 11 pounds) of cocaine, three loaded and operable firearms, sneakers and blue jeans with human blood stains which were consistent with the victim's type, and a .25 calibre automatic Raven brand firearm, which was recovered from the Hudson River near 125th Street. Further, an autopsy confirmed that the injuries described by defendant as having been inflicted on Cuervo were consistent with the cause of death and that the hammer found in the rented truck, which had defendant's palm print on it, was consistent with fractures to the victim's skull.

Pursuant to New York County indictment number 14461/90, filed on December 28, 1990, all three men were charged with hindering prosecution in the first degree (Penal Law § 205.65) and tampering with physical evidence (Penal Law § 215.40). Defendant and Sepulveda were also charged with murder in the second degree (Penal Law § 125.25 [1]), criminal possession of a controlled substance in the first degree (Penal Law § 220.21 [1]), and criminal use of a firearm in the first degree (Penal Law § 265.09 [1]). Additionally, defendant was charged with criminal possession of a weapon in the second degree (Penal Law § 265.03) and four counts of criminal possession of a weapon in the fourth degree (Penal Law § 265.01), and Sepulveda was charged with an additional count of murder in the second degree (Penal Law § 125.25 [3]).[2]

Defendant moved to suppress all of the physical evidence recovered from the truck and the apartments, as well as all of the statements he made subsequent to his arrest. After a hearing, the suppression court denied defendant's motion to suppress except with regard to statements made on November 20, 1990, which occurred after he had asked if he was entitled to an attorney. The trial court found: "that the troopers had the

2. The People maintain in their brief that Sepulveda pleaded guilty to manslaughter in the first degree and was sentenced to 3¹/₃ to 10 years' imprisonment and Torres pleaded guilty to hindering prosecution and was sentenced to time served.

right to make initial inquiries after stopping the van for speeding; that 'suspicion based upon the onset of the hunting season, the nature and speed of the vehicle and the hour' justified a request to inspect the rear of the truck; that 'defendant's posture of candor and cooperation was part of his preconceived strategy to deflect suspicion and to distract the officers from any wish to inspect the contents of the truck'; and that the trooper's request to search and actual search were conducted in a non-threatening and routine manner."

Defendant thereafter proceeded to trial and the jury convicted defendant of murder in the second degree, criminal possession of a controlled substance in the first degree, criminal possession of a weapon in the second degree, three counts of criminal possession of a weapon in the fourth degree and tampering with physical evidence. On appeal, the defendant makes no attempt to confront the overwhelming evidence supporting his conviction. Rather, defendant maintains that the Troopers had no legitimate basis to ask him for consent to search the rental truck, and that the defendant's consent to search was involuntary under the totality of the circumstances. As a result, defendant contends that "all the fruits of the search", consisting of physical evidence as well as his statements, should have been suppressed.

With regard to the initial stop by the Troopers of the defendant's truck, "[a]ll that is required is that the stop be not the product of mere whim, caprice, or idle curiosity. It is enough if the stop is based upon 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion' " (*People v Ingle*, 36 NY2d 413, 420, quoting *Terry v Ohio*, 392 US 1, 21; *People v Durgey*, 186 AD2d 899, *lv denied* 81 NY2d 788). In the matter before us, this standard was clearly met because the Troopers possessed a valid basis for stopping the vehicle as it was proceeding at a rate of 70 miles per hour in a 55-miles-per-hour zone.

The fact that the stop of the truck was lawful, however, does not, by itself, justify the ensuing search (*see, People v Sora*, 176 AD2d 1172, *lv denied* 79 NY2d 864; *People v Mercado*, 165 AD2d 910, *lv denied* 76 NY2d 988). Once the vehicle is lawfully stopped, the Troopers may not proceed to the next level of confrontation, the "common-law inquiry", in the form of a request for consent to search the vehicle, absent a "founded suspicion" of criminal activity (*People v Hollman*, 79 NY2d 181, 191; *People v Battaglia*, 86 NY2d 755, 756; *People v Irizarry*, 79 NY2d 890, 892; *People v Tejeda*, 217 AD2d 932,

933, *lv denied* 87 NY2d 908; *People v Sora, supra,* at 1173; *People v Bond,* 116 AD2d 28, 31, *lv denied* 68 NY2d 767; *People v Carter,* 199 AD2d 817, 819, *affd* 86 NY2d 721).

Courts have sustained a common-law inquiry in the following instances: *People v Battaglia (supra),* where the Court of Appeals affirmed the order of the Appellate Division and held that the police possessed a founded suspicion of criminality justifying a common-law inquiry in the form of a request for defendant to consent to a search of his vehicle based upon the late hour, a traffic infraction, and the fact that the driver's name did not appear in the police computer; *People v Carter (supra,* at 819), where it was held that the police had a founded suspicion that criminal activity was afoot based upon the defendant's "spurious response to the inquiry about the origin and destination of [his] trip"; *People v Tejeda (supra),* where the police were found to have a founded suspicion of criminal activity based upon defendant's illogical responses to the Troopers' questions; and *People v Sora (supra),* where it was found that an anonymous tip concerning a vehicle which matched the description and destination of defendants provided sufficient cause to believe that criminal activity was afoot so as to warrant the Trooper's request for consent to search the vehicle.

The determination as to whether a founded suspicion exists justifying a common-law inquiry in the form of a request for defendant to consent to a search of the vehicle involves a mixed question of law and fact (*People v Battaglia, supra*). Here the finding of the lower court that founded suspicion existed to justify a common-law inquiry is fully supported by the record.

Initially I note that the stop of the truck was validly grounded on a traffic infraction. Next, the totality of the circumstances should be analyzed on a case-by-case basis to ascertain whether a founded suspicion exists to justify a common-law inquiry. In the case at bar, the hunting season brought into the area large influx of hunters many of whom travel with loaded guns and illegally shot game.

Trooper Van Cura added: "Actually, there is a quite a few *[sic]* instances every year of people traveling on [Route] 17 with loaded firearms, especially people from the city. They don't realize they are not allowed to have a clip in the rifle, a loaded clip in the rifle, even if a bullet is not in the chamber. It is still considered a loaded firearm."

As a result of this problem, Trooper Van Cura testified that roving patrols, as well as roadblocks or stationary checks, are

utilized during the hunting season to check for illegal firearms and unlawfully killed wildlife. Given the unique problem in the locality of hunters transporting, by vehicle, illegal firearms and illegally shot deer during the hunting season, and the attending circumstances confronting the Troopers, their request to see the contents of the van was justified.

Here, the Troopers were faced with the following scenario: at approximately 2:00 A.M. in the Town of Harriman, Orange County, New York, a rented truck passed their observation position at an excessive rate of speed. The three men in the truck were from New York City, where many of the hunters in Orange County begin their trips; they were in a van of a type which, one Trooper testified, is sometimes used to transport unlawfully killed game and illegal weapons; they were speeding on a road where Troopers have set up checkpoints to check for illegal firearms and illegally shot deer; and they were travelling in the middle of the night, a time when poachers often operate. Further, the stop occurred on the first night of the hunting season, when Troopers are on heightened alert for hunters transporting illegal firearms and game, and at a time when the Troopers, by statutory mandate (ECL 71-0525 [1] [b]), are empowered to stop vehicles and, if they have probable cause, search them without a warrant.

The Troopers, measured by the reasonableness standard, which requires a weighing of the degree of intrusion against the precipitating and attending circumstances (see, People v Salaman, 71 NY2d 869; People v Sora, supra, at 1173), were therefore justified in their request to see the back of the van. Trooper Van Cura also testified that once people suspected of violating the Environmental Conservation Law were pulled over, "we ask them if the back is * * * if the back is covered, can we look inside the back, and see if there are any rifle cases or shotgun cases or any shells or blood * * *. If they say no and we don't have any probable cause to look in the car, then we let them go."

Turning now to the issue of consent, it is well settled that the voluntariness of the consent must be evaluated and determined from the totality of the circumstances (see, Schneckloth v Bustamonte, 412 US 218, 224; People v Gonzalez, 39 NY2d 122, 128; People v Sora, supra, at 1174; People v London, 124 AD2d 254, lv denied 68 NY2d 1001). Consent to search is voluntary "when it is a true act of the will, an unequivocal product of an essentially free and unconstrained choice. Voluntariness is incompatible with official coercion,

actual or implicit, overt or subtle" (*People v Gonzalez, supra,* at 128; *see also, People v Kuhn,* 33 NY2d 203, 208; *People v Sora, supra,* at 1174).

In *People v Saglimbeni* (95 AD2d 141, 144, *appeal dismissed* 62 NY2d 798), this Court held that "[a] search without a warrant and in the absence of probable cause is valid * * * if based upon consent freely and voluntarily given." (Citing *Schneckloth v Bustamonte, supra; People v Whitehurst,* 25 NY2d 389.)

A review of the record in the matter at hand does not reveal any coercive behavior on the part of the Troopers. Far from being "extended and accusatory" (*People v Hollman,* 79 NY2d 181, 191, *supra),* O'Leary's questioning of defendant was more like a "nonthreatening encounter" (*supra,* at 191) which lasted less than two minutes and which Trooper O'Leary described as "pleasant". The eventual search ensued only after defendant repeatedly, freely and voluntarily told both Troopers "sure, no problem" when they asked if they could take a look inside the back of the truck. Thus, this police-citizen encounter, although "unsettling", as any traffic pullover would be, was not unduly intimidating. Further, the Troopers had not drawn their guns, no threats were made, and defendant had not been placed under arrest, the latter of which by itself does not, in any event, preclude voluntariness (*People v Gonzalez, supra,* at 128; *People v Rodriguez,* 11 NY2d 279, 287).

Moreover, as noted by the trial court, the evidence presented indicated the defendant's decision to consent to the search was the result of an executed strategy of deception. Testimony revealed that prior to leaving New York City, defendant had instructed his companions that if they were stopped, to tell the police he had hired them to help move construction materials, and went so far as to tell the other men how much they were allegedly making per hour so that information, if necessary, could be imparted to the police. Further, he loaded the van with such materials and other items to substantiate his story. From the time he was stopped, defendant was compliant and friendly, he mentioned that his sister was a New York City police officer, displayed a Patrolmen's Benevolent Association card and asked for a "break". Defendant, as the IAS Court found, anticipated that "his posture of cooperation would squelch any further interest by the trooper in the truck's contents." In view of the foregoing, a "finding that defendant's consent was the product of calculation rather than coercion or awe" is supported by the record (*People v Maldonado,* 184

AD2d 531, 532, *lv denied* 80 NY2d 906; *People v Gonzalez, supra,* at 129).

Lastly, defendant contends that his consent to a search was brought about by "overbearing official pressure", i.e., Trooper O'Leary's pat down of defendant as he exited the cab of the vehicle. This argument was apparently never specifically raised before the trial court, and the only testimony concerning the pat down was by Trooper O'Leary, who stated: "I just patted his pockets, made sure he didn't have any weapons on him * * * [w]hen he was getting out of the truck to go to the back." By that point in time, however, defendant, while still in the cab of the truck, had already agreed, quite enthusiastically, to show the Troopers he was ready to cooperate, had proposed to open the truck, and was voluntarily on his way out of the truck when the Trooper patted him down. As a result, defendant cannot claim that his previously proffered consent was the result of coercion.

With regard to the Trooper patting the outside of defendant's pockets, it is well settled that the actions of the Troopers, and whether they were reasonable, turn on the facts of each individual case (*People v Prochilo*, 41 NY2d 759, 761; *People v Green*, 35 NY2d 193, 195). At the time of the stop, the hour was late, it was dark and the onset of the hunting season brought about the inevitable proliferation of firearms, legal and illegal, into Orange County. The Troopers, having stopped three men in a rental van, were, therefore, understandably concerned about their safety which, in my view, justified the reasonableness of the police action of touching the outside of defendant's pockets (*People v Stewart*, 41 NY2d 65, 66-67; *People v Clements*, 88 AD2d 541, 543, *appeal dismissed* 58 NY2d 821).

Opinion by RUBIN, J. All concur except SULLIVAN and ROSS, JJ., who concur in a separate opinion by SULLIVAN, J., in which MURPHY, P. J., concurs; TOM, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, rendered December 19, 1991, reversed, on the law, the motion to suppress physical evidence and defendant's statements granted, and the matter remanded to Supreme Court for further proceedings.