Maltese, J., dissents, and votes to affirm the judgment, with the following memorandum: Contrary to the view of my colleagues in the majority, I agree with the suppression court that the arresting officer’s efficient and reasonable inquiry at the scene was justified under the totality of the circumstances and that the police conduct in this case was lawful. I do not explicitly disagree with my colleagues’ recitation of the arresting officer’s testimony at the suppression hearing. However, I do believe that this evidence, when viewed as a whole and in light of the reasonable inferences that may be drawn therefrom, paints a picture that is different from the one presented by my colleagues. I believe, as did the suppression court, that the evidence sets a scene wherein the arresting officer was reasonably suspicious of some manner of criminal activity afoot (see People v De Bour, 40 NY2d 210 [1976]) and the defendant volunteered his consent to “check” his car for contraband. At 3:10 a.m. on a Saturday morning, the arresting officer was in uniform and on patrol duty in an unmarked police vehicle when he received a radio run describing an armed man fleeing the front of a deli in Queens. The officer and his partner drove to the specified location and canvassed the area, but they did not locate the suspect described in the radio run. Twenty minutes later, at approximately 3:30 a.m., the defendant drove a red Mitsubishi at a high rate of speed and cut off the unmarked police vehicle. The defendant made a left turn from the far right lane of traffic, and then made another left turn through a red light. Due to these traffic infractions, the officer turned on his emergency lights, and the defendant slammed on the brakes and came to a sudden stop in the middle of the road. Using his loudspeaker, the officer directed the defendant driver to pull over. The officer then approached the driver’s side of the vehicle, and his partner approached the passenger side, where a passenger was sitting in the front passenger seat. Neither officer removed their weapons from their holsters. While the officer was approaching the vehicle, he observed a Coach brand woman’s handbag in the backseat. At first, as aptly noted by the majority, he thought that the front-seat passenger “possibly fit[ ]” the description from the radio run (both the defendant and the passenger were young black males). The officer smelled a strong odor of alcohol coming from the defendant. When the officer asked the defendant if there was anything illegal on him or in the vehicle, the defendant immediately replied, “No, officer. You can check.” The officer directed the defendant and his passenger to step out of the vehicle. Both men were frisked and no weapons were found. When the officer asked the defendant where he was coming from, the defendant said that he was coming from a strip club, and he confirmed that he had been drinking alcohol. While the defendant and the passenger were standing outside the car, the officer looked into the backseat. There were several items in the backseat, including the Coach handbag. The officer stated that the handbag “grabbed [his] attention” because something seemed strange about two men driving a vehicle with a handbag in the backseat. Next to the handbag, the officer saw a camera and a white cell phone. Acting upon the defendant’s unsolicited consent to “check” the vehicle for illegal items, the officer looked inside the handbag to see if any markings identified its owner. The officer also turned on the camera and saw that all the photographs were of people who appeared to be Asian. When the officer asked “who the camera belonged to,” the defendant stated that it belonged to his girlfriend, who he described as “Dominican,” and said that he “bought [the camera] off of a crack head in the Rockaways.” Then, the officer picked up the cell phone and dialed the most recent number. A young woman answered and informed the officer that the handbag, camera, and cell phone belonged to an Asian exchange student who lived in Flushing. The woman on the phone had seen the owner of the property earlier that evening, and she could not explain why the items were in the defendant’s possession. At this point, the officer arrested the defendant and the passenger and called for another police vehicle. When the next police vehicle arrived, the officers used its computer to search recent police reports. A robbery complaint report showed that a matching Coach handbag, cell phone, and camera had been taken during a robbery earlier that evening. Thereafter, the officers transported the defendant, the passenger, and the vehicle back to the police station. During an inventory search of the vehicle, conducted pursuant to procedures set forth in the New York City Patrol Guide, a police officer visually inspected the center console radio and noticed that the radio face bracket appeared to be “unclicked” or “unsnapped.” Further inspection led to the discovery of a handgun behind the face bracket. At the police station, the defendant signed a written waiver of his Miranda rights (see Miranda v Arizona, 384 US 436 [1966]) and made several inculpatory statements. Among other things, he explained how he obtained the handgun, his proximity to the robbery victim, and his plan to sell the camera. The interview lasted approximately one hour. The defendant did not present any evidence at the suppression hearing. After the hearing, the suppression court, crediting the People’s witnesses, concluded that the traffic stop was justified, the defendant voluntarily consented to a search of the vehicle, the subsequent inventory search was valid, and the defendant’s statements at the police station were voluntarily made after he waived his Miranda rights. I agree. On these facts, the prosecution met its initial burden of going forward with evidence demonstrating the “legality of the police conduct in the first instance” (People v Moses, 32 AD3d 866, 868 [2006]). In New York, the propriety of an encounter between a police officer and a person is generally measured by the graduated four-level test set forth in People v De Bour (40 NY2d 210 [1976]; see People v Garcia, 20 NY3d 317 [2012]). The relevant inquiry is whether the encounter was justified at its inception and whether the police action was “reasonably related in scope to the circumstances which rendered its initiation permissible” (People v De Bour, 40 NY2d at 222; see People v Moore, 6 NY3d 496, 498 [2006]). Here, we all agree that there was a valid vehicle stop, justified by the arresting officer’s observation of multiple traffic offenses. In my view, the timing and nature of the several traffic offenses did more than justify the stop. These high-speed traffic violations, committed with abandon in the wee hours of the morning on a Saturday, would provide a reasonable officer with grounds not only to make a traffic stop, but also to develop reasonable suspicion that something more sinister may be afoot (cf. People v Graves, 142 AD3d 559, 560 [2016]; People v Jackson, 158 AD2d 545, 545 [1990]). Although the arresting officer may have better articulated his thought process as to why he proceeded the way he did, the suppression court considered all the evidence adduced by the People and made logical inferences in reaching a determination as to whether the police conduct was lawful. In addition to the time of night and the defendant’s high rate of speed and erratic driving, the officer testified that the passenger might have fit a description of a gun-toting suspect from a recent radio run. More importantly, the officer’s suspicion was further aroused when he saw a Coach handbag in plain view before he reached the driver’s side window. He thought it unusual that two men out for a late night, high-speed ride had a handbag in the backseat. Under these circumstances, the suppression court properly concluded that the traffic stop was valid and that the arresting officer’s conduct, including ascertaining where the driver and occupant were coming from—a strip club where they acknowledged that they were drinking—and asking whether the defendant had anything illegal in the vehicle, was a justified level-two inquiry (see People v De Bour, 40 NY2d at 215-222; People v Graves, 142 AD3d at 560; People v Brito, 244 AD2d 631 [1997]; cf. People v Garcia, 20 NY3d at 324; People v Battaglia, 86 NY2d 755, 756 [1995]; People v Stevenson, 7 AD3d 820, 821 [2004]; People v Williams, 300 AD2d 684, 685 [2002]). Further, the suppression court properly concluded that the defendant volunteered his consent to search the vehicle. “Consent to search, a relinquishment of constitutional protection under both the Federal and State Constitutions against unjustified official intrusion, must be a free and unconstrained choice. Official coercion, even if deviously subtle, nullifies apparent consent. Whether consent has been voluntarily given or is only a yielding to overbearing official pressure must be determined from the circumstances” (People v Gonzalez, 39 NY2d 122, 124 [1976]; see People v Turriago, 219 AD2d 383, 389 [1996], mod 90 NY2d 77 [1997]). The People have a heavy burden of proving the voluntariness of a defendant’s consent to a search, “which is a question of fact that must be determined from the totality of the circumstances” (People v Quagliata, 53 AD3d 670, 671 [2008]; see People v Concepcion, 69 AD3d 956, 956 [2010], mod 17 NY3d 192 [2011]). Here, considering the totality of the circumstances, the People met their burden of demonstrating that the defendant’s consent was voluntarily given and was not the product of coercion (see generally People v Xochimitl, 147 AD3d 793, 794 [2017]). Significantly, the arresting officer never asked the defendant for his consent to search the vehicle (cf. People v Irizarry, 79 NY2d 890, 892 [1992]; Matter of Antoine W., 79 NY2d 888, 890 [1992]). Instead, the defendant immediately responded to the officer’s question about whether he had anything illegal on his person or in the vehicle, “No, officer. You can check.” Moreover, there was little or no indicia of coercion prior to the defendant volunteering his consent to “check” the vehicle (cf. People v Gonzalez, 39 NY2d 122 [1976]). The record demonstrates that the arresting officer and his partner never laid hands upon their firearms, let alone removed them from their holsters (cf. People v Quagliata, 53 AD3d at 672). Instead, the officer asked a simple question, which promptly yielded the defendant’s voluntary consent to go ahead and “check” the vehicle. There was not a prolonged period of questioning or detainment, and there was no indicia of harassment (see People v Leiva, 33 AD3d 1021, 1023 [2006]; cf. People v Woods, 189 AD2d 838, 839-843 [1993]; People v Mikel, 152 AD2d 603, 605 [1989]). Accordingly, because the police conduct was lawful and the proceeds of the robbery were obtained after the defendant volunteered his consent to search the vehicle, the suppression court properly denied those branches of his omnibus motion which were to suppress the handbag, the cell phone, and the camera (see People v Abraham, 111 AD3d 756, 757 [2013]; cf. People v Turriago, 219 AD2d at 387). Further, the suppression court properly declined to suppress the handgun discovered during the inventory search of the defendant’s vehicle. Inventory searches of an automobile after the lawful arrest of the driver are permissible as an exception to the warrant requirement (see People v Padilla, 21 NY3d 268, 272 [2013]; People v Morman, 145 AD3d 1435, 1436 [2016]). Here, the evidence at the suppression hearing demonstrated that the inventory search was valid because it was conducted pursuant to established police procedures and the items removed from the vehicle were each assigned a voucher number (see People v Taylor, 92 AD3d 961, 962 [2012]; cf. People v Gomez, 13 NY3d 6, 11 [2009]), which created a “usable inventory” of the vehicle’s contents (People v Ewart, 130 AD3d 1062, 1062 [2015] [internal quotation marks omitted]; see People v Cochran, 22 AD3d 677, 677-678 [2005]). At trial, the robbery victims identified the Coach handbag, the camera, and the cell phone as the items forcibly taken from them. In sum, it is my view that, under the totality of the circumstances in this case, the police officers used their training and experience to ask simple and reasonable questions, when they possessed reasonable suspicion that criminality may be afoot, to resolve the situation peacefully rather than drawing their guns or otherwise threatening or using unnecessary force. Consequently, the suppression court properly denied suppression of the Coach handbag, the cell phone, the camera, the gun, and the defendant’s statements to police. Accordingly, I would affirm the judgment of conviction.