■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ROBERT APONTE, Respondent.

During the early morning hours of July 3, 1984, in Bronx County, New York City Police Officer Patrick O'Connor (Officer O'Connor) arrested defendant for the possession of a loaded .25 caliber automatic pistol. Following his indictment for two counts of criminal possession of a weapon in the third degree (Penal Law § 265.02) and one count of possession of burglar's tools (Penal Law § 140.35), defendant moved to, *inter alia,* suppress this weapon. Thereafter, a suppression hearing (Hearing) was held.

The People presented the only witnesses at the Hearing, and they were Officer O'Connor and New York City Police Officer James Simpson (Simpson). The facts set forth *infra* are derived from our examination of the Hearing transcript.

In 1984, Officer O'Connor had been a member of the Police Department for more than 18 years, and he was assigned to the Bronx Task Force Auto Larceny Unit.

On July 3, 1984, Officer O'Connor, in uniform, was one of three officers in a marked police vehicle who were conducting an auto larceny patrol. The other two officers were Officer Simpson and New York City Police Officer Gregory Dardzinski (Dardzinski).

At approximately 2:55 A.M., Officer O'Connor testified that he observed, in the vicinity of 1275 Pugsley Avenue, an illegally double-parked 1982 Chevrolet Malibu, with somebody inside. In response to his observation, Officer O'Connor made a U-turn and came back to the double-parked car. When he arrived there, Officer O'Connor saw the defendant and a juvenile standing beside it. Thereupon, Officer O'Connor testified: "I asked them if they had trouble, mechanical trouble,

with their car. They answered in the negative, that they didn't, and, in fact, it wasn't their car."

Officer O'Connor exited the police vehicle, and he immediately observed: glass on the ground, the window on the driver's side of the double-parked car had been broken, the radio had been partially removed from that car's dashboard and was on the front seat, and strewn in a sloppy manner throughout the rear of the car were papers and items of clothing.

The defendant, whose hands appeared "greasy, oily" like those of a person who had been working on a car, informed Officer O'Connor that allegedly sometime earlier "four West Indians" had taken some property away from the double-parked car. Furthermore, the defendant told this officer he was just "checking out" the double-parked car, and was safeguarding property in it for the owner. Moreover, Officer O'Connor testified that he inquired of the defendant "whose car it was, [and] he [defendant] said it's the Ecuadorians' car * * * At this time, I thought * * * he [defendant] had known the Ecuadorian people he had spoken of, and I asked him where they were, and who they were, and he said that he was going to contact them". However, in the course of further conversation between the defendant and Officer O'Connor, the defendant, in substance, admitted that he did not actually know the Ecuadorians for whom he claimed that he was safeguarding property.

Since defendant had advised the officer that he was safeguarding property for an owner he did not know, Officer O'Connor testified: "At this point in time, I requested the property of the people. He [defendant] told me the property was in a car of his that was parked at the curb several [car lengths] down * * * towards * * * Westchester Avenue * * * I requested that he allow me in [defendant's] car and * * * he handed me keys". In addition to voluntarily handing his car keys to the officer, the defendant also volunteered the statement that he was holding some "papers" for the Ecuadorians in the rear of his car, behind the passenger seat.

Officer O'Connor testified that he subsequently opened the door to defendant's car, and "I did see an envelope with several papers in it * * * behind the passenger's seat. Also, I saw * * * electronic equipment, either a tape deck or tape recorder of some sort and a tape. When I went in and retrieved the envelope and the papers, I think there was a passport there for the Ecuadorian family that he described. I

also picked up the recorder and the tape, and at that point in time, the defendant * * * said to me * * * 'That's theirs [the Ecuadorians], too. I'm holding that also' ".

After retrieving the papers and tape material from inside of defendant's car, Officer O'Connor placed those items on top of the trunk of defendant's car, where there were "a few screwdrivers laying in the open".

At this juncture, Officer O'Connor became suspicious of the defendant's story that he was safeguarding property. The main facts that led Officer O'Connor to conclude defendant's explanation "no longer fit together" were, as follows: he had found not only papers in defendant's car, but he had also discovered tape material, which as soon as the officer picked it up, the defendant exclaimed "that's theirs, too. I'm holding that also"; the screwdrivers he saw laying on top of the trunk; the glass he saw on the ground near the double-parked car; and, the disorderly condition of the double-parked car, in that the window on the driver's side was broken, the dashboard was damaged, and papers and clothing were scattered about the back of that car.

As a result of his suspicion, Officer O'Connor decided to again enter defendant's car, in order to determine if there was more property in there that belonged to the owner of the double-parked car. Thereafter, Officer O'Connor squatted down and peered into defendant's car from the previously opened passenger side door, and he testified: "I saw the arm rest in the down position. I flipped the arm rest up to see if there was any more property on the seat. When I flipped the arm rest up, I heard a sound. There was a noise. Something obviously fell from the interior of the arm rest, and I immediately pulled the arm rest back down, expecting to find some other property. When I reached inside, I pulled out a twenty-five caliber automatic pistol in a holster."

Officer O'Connor immediately announced to Officers Simpson and Dardzinski that he had found a gun, and he then arrested defendant.

Officer Simpson, as mentioned *supra,* was the only other Hearing witness, since the defendant neither testified himself nor offered any other evidence.

In substance, the testimony of Officer Simpson, who was also in uniform at the time of the incident, corroborated Officer O'Connor's account of the incident.

Although the hearing court found the officers' testimony credible, it granted defendant's motion to suppress the pistol.

We disagree.

Usually we accept the factual determinations of the hearing court, but we have not hesitated to reject such factual findings, when they lack an evidentiary basis in the record *(see, e.g., People v Saglimbeni,* 95 AD2d 141, 145 [1st Dept 1983], *appeal dismissed* 62 NY2d 798 [1984]). Based upon our review of the instant transcript, we find that the hearing court erred when it determined that there was no evidence to supply probable cause for Officer O'Connor to reenter defendant's car.

It would be ridiculous for anyone to argue that Officer O'Connor was not duty bound to stop and offer assistance when he observed, early in the morning, a double-parked car, with the defendant and juvenile standing outside of it. Chief Judge Wachtler wrote for a majority of the Court of Appeals in *People v De Bour* (40 NY2d 210, 218 [1976]): "The role of the police in our society is a multifaceted one * * * [W]e must recognize the multiplicity and complexity of tasks assumed by the police. As public servants, the police perform the lion's share of services expected of local government. Among other functions, the police in a democratic society are charged with the protection of constitutional rights, the maintenance of order, the control of pedestrian and vehicular traffic, the mediation of domestic and other noncriminal conflicts and supplying emergency help and assistance [citations omitted]".

This experienced officer initially believed the defendant's explanation that he was simply "checking out" the double-parked car, and was safeguarding property for that car's owner, because at that moment the story seemed plausible. Nevertheless, as the defendant's and the officer's encounter continued, Officer O'Connor became aware of additional facts which supported further investigation on his part. For example, during the conversation between them, defendant revealed that he did not actually know the owner of the property he was allegedly safeguarding in his own car. After the defendant made that admission, the officer requested permission from the defendant to be allowed to enter defendant's car, and the defendant knowingly and voluntarily gave the officer his car keys. We find that "a defendant who voluntarily gives his keys to a police officer to permit his vehicle to be searched * * * makes a valid consent to search" *(People v Abrams,* 95 AD2d 155, 157).

Furthermore, we also find that when Officer O'Connor put the facts together, he properly became suspicious of the validity of defendant's explanation. As mentioned *supra,* these facts

included: Officer O'Connor's finding papers as well as tape material on his first visit to defendant's car; his observation of the screwdrivers on defendant's trunk; and, his remembering that he had seen glass on the ground near the double-parked car as well as damage in that car. In our opinion, this officer's suspicion was based upon sufficient evidence that entitled him to reenter defendant's car to search for more property from the double-parked car which might be found in there. Incidentally, our examination of the record indicates no evidence that defendant ever revoked his consent to search his car. Therefore, "[d]efendant's conduct evinced a broad consent, especially since he freely gave the [officer] the key to car" *(People v Abrams, supra,* at p 159).

We held in *People v Berry* (87 AD2d 53, 56 [1st Dept 1982]): "Where * * * the encounter is initiated by activity occurring on the street, the touchstone becomes the reasonableness of the police activity". Applying this standard to the facts herein, we conclude that "there was an ample measure of reasonable suspicion necessary to justify the limited intrusion which produced the loaded [pistol]" *(People v Benjamin,* 51 NY2d 267, 271 [1980]).

Accordingly, in view of the fact that we find the officer's continued search of the defendant's car was supported by probable cause, we reverse the hearing court, and deny the defendant's motion to suppress. Concur—Sandler, J. P., Sullivan, Ross, Carro and Asch, JJ.