[810 NYS2d 437]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v STEPHEN GRUNWALD, Appellant.

First Department, February 14, 2006

## APPEARANCES OF COUNSEL

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Sara Gurwitch* of counsel), and *Cadwalader, Wickersham & Taft, LLP*, New York City (*Joshua M. Bennett, Junea M. Williams, Shanna Green* and *Douglas I. Koff* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Om Gillett* and *Donald J. Siewert* of counsel), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

On appeal from his conviction, by plea of guilty, of attempted criminal possession of a weapon in the third degree, defendant challenges the propriety of the denial, after a hearing, of his motion to suppress drugs recovered from his person and a knife found nearby on the sidewalk at the time of his arrest. Specifically, defendant argues that the police unlawfully seized him before the recovery of the knife and drugs, which then became the fruits of the unlawful police interference.

Police Officer David Riley, the sole witness at the hearing, testified that on the evening of August 7, 2003 he was assigned with two other officers, all in uniform, to summons patrol, looking for "quality of life" offenses, such as peddling or possessing open containers of alcohol. Shortly after 7:00 P.M., while it was still daylight, Riley was driving a marked radio car westbound under 10 miles per hour on West 115th Street in Manhattan, an area known to the police as drug-prone, when he observed defendant, walking east on the sidewalk about 50 feet away, smoking what Riley believed was a small marijuana cigarette. Riley's opinion was based on the size of the object in defendant's hand ("maybe half an inch"), the lack of a filter, that it was rolled and that defendant was smoking it down close to his fingers. Riley never saw defendant exhale smoke nor did he see that the object was lit.

Officer Riley stopped the patrol car, exited about 20 to 25 feet from defendant and called out, "[c]ome over here." As he and his partner approached defendant on foot, Riley smelled PCP. Defendant turned and began walking west. Riley, who had been in the street, then walked around a parked car and positioned himself in defendant's path, about 15 feet in front of him. There

was a parked car to defendant's left and a chain-link fence to his right.

At that point, defendant turned away from Riley and threw the object in his hand over the fence into a lot. Defendant then turned back toward Riley, holding a gravity knife in his right hand with the blade exposed, pointing it at Riley. The blade was about four inches. Riley responded by drawing his gun and directing defendant to drop the knife. His partner also drew his gun and ordered defendant to drop the knife. Defendant did not do as ordered but, instead, kept the knife pointed at Riley as he turned his head to look at Riley's partner. As he did so, Riley was able to reholster his gun and knock the knife from defendant's hand. According to Riley, it took him 5 to 10 seconds to approach defendant and knock the knife from his hand. After a brief struggle, Riley and his partner were able to handcuff defendant and place him under arrest. Riley searched him and recovered two bags of PCP and also recovered the knife from the sidewalk.

In urging suppression, defense counsel argued that Riley's initial observation of defendant was equally susceptible of an innocent explanation and, therefore, did not even give him the right to make an inquiry, much less order defendant to stop. Thus, defendant had the right to walk away and refuse to answer Riley's questions. Defendant's act of walking away gave Riley no greater right to inquire of or detain him. Counsel further argued that since Riley did not see the object being thrown, he had no reason to believe defendant was disposing of something. Counsel also suggested that Riley had no clear and unobstructed view of the knife, did not know that it was a gravity knife and, in the absence of any threat, had no right to arrest defendant or even draw his gun.

The prosecutor argued that after observing defendant smoking what appeared to be a marijuana cigarette, Riley had the right to approach and question him. When defendant refused to stop and, instead, turned and walked in the opposite direction, Riley merely walked in the same direction until he was able to confront defendant, who then threw an object over the fence, turned and pointed a knife at the officer. At that point, the prosecutor argued, Riley had the right to protect himself and properly drew his gun. The prosecutor further argued that the police also acted properly in ordering defendant to drop the knife, and that when defendant refused, Riley, believing that "his life was at stake," took reasonable steps to defend himself.

Finding Riley's testimony credible, the hearing court made the following determinations: Riley's initial observations of defendant smoking what appeared to be a marijuana cigarette created a level I situation (*see People v De Bour*, 40 NY2d 210, 215 [1976]), permitting him to inquire. Thus, Riley had reasonable grounds to ask defendant to stop so that he could ask questions of him. But instead of stopping, defendant walked away. While defendant, to be sure, had the right to walk away, the officer also had the right "to clarify the situation." After the officer moved to a position where he faced defendant, the latter turned and threw whatever he had in his right hand over the fence, and then turned back to face Riley, holding a knife and pointing it at the officer at a distance of 15 feet. Until then, Riley had neither probable cause to arrest nor reasonable suspicion to justify a forcible stop. But this "change of circumstances" escalated the encounter from a level I under *De Bour* to one in which Officer Riley had probable cause to disarm and arrest defendant. The hearing court found that the knife was properly recovered from the ground and that the PCP was also properly taken from defendant in a search incident to his arrest. The court denied suppression.

Defendant subsequently pleaded guilty to criminal possession of a weapon in the third degree in satisfaction of the indictment. On the sentence date, after vacating his previous guilty plea and allowing defendant to plead guilty to attempted criminal possession of a weapon in the third degree, the court sentenced him as a predicate felon to 1½ to 3 years imprisonment, as promised. This appeal followed. We affirm.

Raising only the issue of the denial of his suppression motion, defendant argues that when Officer Riley deliberately walked ahead and positioned himself in front of him, he was subjected to a seizure without reasonable suspicion. Alternatively, assuming that the encounter did not constitute a seizure, defendant argues that it was, at a minimum, a level II *De Bour* intrusion without the requisite founded suspicion that criminal activity was afoot to justify it.

At the outset, we reject the concomitant claim that Officer Riley's testimony was, as a matter of law, incredible. There is nothing about Riley's testimony that makes it "impossible of belief because it is manifestly untrue, physically impossible, contrary to experience, or self-contradictory" (*People v Garafolo*, 44 AD2d 86, 88 [1974]). While defendant asserts that Riley could not have seen that defendant was smoking a marijuana

cigarette, the hearing court, for proper reasons, found otherwise. "[M]uch weight must be accorded the determination of the suppression court with its peculiar advantages of having seen and heard the witnesses" (*People v Prochilo,* 41 NY2d 759, 761 [1977]).

As to the operative facts, Riley, on summons patrol, was looking for evidence of crimes such as the marijuana offense in this case. It was still daylight at the time, so Riley's observations were not impeded by darkness. The area was drug-prone, a factor the officer could consider (*see People v Martinez,* 80 NY2d 444, 448 [1992]). There is nothing in the officer's testimony to cast doubt on his credibility or to suggest that it was tailored to meet constitutional objections. The testimony merely reveals the facts as they were unfolding from the time Riley first noticed defendant on the sidewalk.

Nor was Officer Riley's conduct unlawful, as claimed. It is well settled that the "crucial factor" in evaluating street encounters between a police officer and a civilian is whether the officer acted reasonably under all the circumstances (*De Bour,* 40 NY2d at 217). In *De Bour,* the Court of Appeals set forth a four-tiered structure to evaluate police conduct in such encounters. Key to any *De Bour* analysis is that at each stage of an encounter the level of police intrusion must be justified by the factual basis leading to it. Thus, at the first level, police may approach civilians to request information "when there is some objective credible reason for that interference not necessarily indicative of criminality" (*id.* at 223). The second level, the common-law right to inquire, allows police to interfere with a citizen's freedom, short of seizure, "to the extent necessary to gain explanatory information," provided the police have a founded suspicion that criminal activity is afoot (*id.*). Level III, activated when the police have reasonable suspicion that a person "has committed, is committing or is about to commit a felony or misdemeanor," allows a "forcible stop and detention of that person" (*id.*). Level IV permits the police to arrest a person based upon facts that create probable cause to believe that person has committed a crime or has committed an offense in an officer's presence (*id.*; CPL 140.10 [1]).

*De Bour* itself provides an example of a level I encounter. Two police officers on foot patrol shortly after midnight observed the defendant walking toward them on the same side of the street. When he was 30 to 40 feet from the officers, the defendant crossed the street, prompting the officers to do likewise. When

the defendant reached them, the officers asked him what he was doing in the neighborhood. The defendant "nervously" responded that he had just parked his car and was heading toward a friend's house (*id.* at 213). The officer asked for identification and, as the defendant answered that he had none, the officer noticed a bulge in the defendant's jacket. The officer asked the defendant to unzip his jacket and, upon defendant's compliance, observed a gun. The Court determined that the encounter was justified at its inception and that the intrusion that followed was reasonably limited in scope and intensity (*De Bour,* 40 NY2d at 221). The Court also concluded that the encounter was not a level II situation, stating that "[b]efore the police may stop a person pursuant to the common-law right to inquire there must exist at that moment a founded suspicion that criminal activity is present" (*id.* at 215, citing *People v Cantor,* 36 NY2d 106 [1975]). That there was no such founded suspicion in *De Bour* is implicit in the Court's rejection, as "a sheer bootstrap," of the People's suggestion that the officers' action was justified in order to determine whether criminal activity was afoot (*id.*). Thus, the encounter in *De Bour* must have been at level I.

Here, the hearing court's determination that Officer Riley's initial contact with defendant constituted a level I encounter, a mere request for information, was by *De Bour* standards correct. Defendant's smoking what Riley perceived to be a marijuana cigarette, while inconclusive as to whether marijuana was actually present and therefore not necessarily indicative of criminality, presented the officer with a situation that required clarification. In such circumstances, Riley had the right and indeed, as the hearing court found, the duty, to inquire (*see People v Thornton,* 238 AD2d 33 [1998]; *Matter of Jaime G.,* 208 AD2d 382 [1994]). Riley's request to "[c]ome over here" did not escalate the encounter. While, as the hearing court found, defendant was free to leave, Riley did not have to abort his limited approach just because defendant chose to turn and walk in the opposite direction. Officer Riley could pursue his right and duty to inquire even if it meant getting ahead of defendant and confronting him face to face.

It was at this point that a drastic change in circumstances occurred. Defendant threw the object he had been seen holding over the fence, turned toward Riley and brandished a knife at him. As the hearing court held, at that point Officer Riley had probable cause to arrest defendant (*see De Bour,* 40 NY2d at

223). The encounter began at level I, in which Riley merely sought to inquire of defendant, and remained at that level until defendant displayed the knife.

Nor, as defendant argues, did the encounter constitute a seizure unsupported by reasonable suspicion. Defendant claims that he was unlawfully seized when Officer Riley and his partner cornered him between themselves, a parked car and a nearby fence. An essential component of a seizure is that the police interference cause a "significant interruption" in the suspect's freedom of movement (*Cantor*, 36 NY2d at 111). There, for example, three plainclothes officers on surveillance had observed the defendant and a companion inside an apartment, apparently smoking marijuana. The officers, in an unmarked car, later followed the defendant in his automobile and, at 3:00 A.M., when he stopped and parked, decided to stop the defendant and ascertain his identity. Two of the officers exited their vehicle while the third positioned the vehicle so as to block the defendant's car. From different directions, the three officers then converged on the defendant who, now standing alongside his car, drew a gun before the officers could identify themselves. The officers disarmed the defendant and placed him under arrest. The Court of Appeals found that the officers had unlawfully seized the defendant in that he "was deprived of his freedom of movement when he was encircled by three police officers as he stood alongside his car which was blocked by the police vehicle. At that moment he could not have proceeded on his way, therefore he was seized" (*id.* at 111-112).

The facts here are distinguishable. Officer Riley, who walked to position himself in front of defendant on the sidewalk, did not get any closer than 15 feet when defendant pulled a knife. There had been no pursuit. Neither Riley nor his partner touched defendant. They did not accost him in a hostile or intimidating manner, nor did they impede his progress in any way. Riley's request that defendant "[c]ome over here" did not transmogrify the encounter into a seizure (*see People v Bora,* 83 NY2d 531, 535-536 [1994]). The record fails to support defendant's claim that he was "cut off," "surrounded" and "cornered" by the police. Rather, it demonstrates that his liberty of movement was not significantly interrupted by the officers' conduct before he threw the object in his hand and drew the knife. In fact, at the time defendant took those actions, as this record shows, he was not even aware that Riley's partner was behind him.

Defendant's alternative argument that Officer Riley's testimony established, at a minimum, a level II confrontation without a founded suspicion that criminal activity was afoot is without merit. Since Riley did not interfere with defendant's freedom of movement or ask him any questions, whether there was a sufficient showing of criminal activity to justify a level II stop is irrelevant.

We have considered defendant's other arguments and find that they are without merit.

Accordingly, the judgment of the Supreme Court, New York County (Robert H. Straus, J., at suppression hearing; Jeffrey M. Atlas, J., at plea and sentence), rendered April 20, 2004, convicting defendant, upon his plea of guilty, of attempted criminal possession of a weapon in the third degree, and sentencing him, as a second felony offender, to a term of imprisonment of 1½ to 3 years, should be affirmed.

FRIEDMAN, J.P., NARDELLI, WILLIAMS and SWEENY, JJ., concur.

Judgment, Supreme Court, New York County, rendered April 20, 2004, affirmed.