■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v STEPHEN LOMILLER, Also Known as STEPH MILLER, Respondent. [818 NYS2d 27]—

Order, Supreme Court, New York County (James A. Yates, J.), entered on or about August 23, 2004, which, upon granting reargument, adhered to its prior determination suppressing physical evidence recovered from defendant's person, unanimously reversed, on the law and the facts, defendant's motion to suppress denied, and the matter remanded for further proceedings. Appeal from order, same court and Justice, entered on or about June 30, 2004, unanimously dismissed, as superseded by the appeal from the subsequent order.

In the decision at issue, the hearing court, almost exclusively crediting the testimony of defendant, found that the two New York City police detectives' initial approach of defendant, who the court found to be "unquestionably . . . a person of transgender appearance and display," to be an improper level two inquiry which was unjustified by defendant's "[s]imple possession of a purse."

It is well settled that any inquiry into the propriety of police conduct must weigh the degree of intrusion entailed against the precipitating and attending circumstances out of which the encounter arose (*People v Salaman*, 71 NY2d 869, 870 [1988]; *People v De Bour*, 40 NY2d 210, 223 [1976]). The court's focus must concentrate on whether the conduct of the police was reasonable at the time in view of the totality of the circumstances (*People v Batista*, 88 NY2d 650, 653 [1996]; *People v Alvarez*, 308 AD2d 184, 187 [2003], *lv denied* 3 NY3d 657 [2004]), for reasonableness is the touchstone by which police-citizen encounters are measured (*People v Molnar*, 98 NY2d 328, 331 [2002]; *People v Hensen*, 21 AD3d 172, 175 [2005], *lv denied* 5 NY3d 828 [2005]).

In *People v De Bour* (40 NY2d 210, *supra*), the Court of Appeals delineated a "four-tiered method for evaluating the propriety of encounters initiated by police officers in their criminal law enforcement capacity" (*People v Hollman*, 79 NY2d 181, 184 [1992]): a level one request for information, the least intrusive level of police inquiry, is justified by "an objective, credible reason not necessarily indicative of criminality" (*People v Ocasio*, 85 NY2d 982, 985 [1995]); level two, the common-law right to inquire, which falls short of forcible seizure, must be based upon a founded suspicion that criminal activity is afoot (*Matter of Steven McC.*, 304 AD2d 68, 70-71 [2003], *lv denied* 100 NY2d 511 [2003]); level three authorizes an officer to forcibly stop and detain an individual, and requires that the officer possess a reasonable suspicion that the person has committed, or is about to commit, a crime (*People v Moore*, 6 NY3d 496, 498-499 [2006]); and level four, arrest, which requires probable cause (*id.* at 499).

In reviewing the factual determinations of the hearing court, we are aware of our duty, generally, to defer to the hearing court's findings (*People v Sanchez*, 248 AD2d 306, 306-307 [1998], *lv denied* 92 NY2d 930 [1998]), and to substitute our own findings on credibility only when the hearing court's findings are unjustified or clearly erroneous (*People v Butler*, 27 AD3d 365, 368 [2006]; *People v Corbin*, 201 AD2d 359 [1994]). We have, however, " 'not hesitated to reject [the] factual findings [of a hearing court] when they lack an evidentiary basis in the record' " (*Butler* at 368, quoting *People v Aponte*, 124 AD2d 489, 492 [1986], *lv denied* 69 NY2d 743 [1987]), or when the hearing court has placed undue weight on certain evidence and too little weight on contrary evidence (*People v Roberts*, 298 AD2d 295, 298 [2002]; *People v Tempton*, 192 AD2d 369, 371 [1993], *lv denied* 82 NY2d 760 [1993]).

In this matter, we agree with the hearing court's finding, in both of its decisions, that the officers' approach consisted of a level two inquiry. We find inexplicable, however, the hearing court's observation, again in both its original decision and the decision on reargument, that defendant was "unquestionably" a person of transgender appearance and display, a finding the court relied on to explain defendant's possession of, and/or his rummaging through, a woman's purse. Indeed, Detective Danaher, a 19-year veteran of the New York City Police Department who had made over one thousand theft-related arrests, unequivocally testified that defendant looked like a man when he was arrested. The detective's statements were firmly supported by the arrest photograph of defendant, which depicts an unshaven defendant wearing what appears to be a dark jacket over a red sweater or tee shirt, with what seems to be two to three days' growth of beard. Defendant's own testimony lends no support to the hearing court's finding as he never claimed to present a female appearance, instead claiming, alternatively, that he wore a "regular" Ralph Lauren Polo sweater, which he later described as a woman's sweater, but which was, in any event, covered by a jacket, blue jeans and a metal belt.* As a result, we conclude that the hearing court's finding that defendant had maintained a transgender appearance to be unsupported in the record.

With regard to the detectives' initial approach of defendant, Detective Danaher's testimony, both straightforward and consistent, indicated that he and his partner were traveling southbound in an unmarked car on Second Avenue. The detectives were stopped in traffic, between 27th and 28th streets, in the right-hand lane when Danaher observed defendant, on the right side of the street, bent over in a doorway, rifling through a woman's pocketbook while nervously looking up and down the street. Danaher averred that two males appeared to be acting as lookouts, and that from his vantage point, he could see defendant take something that looked like a credit card out of the pocketbook and place it in his pocket. The detectives pulled their vehicle over, approached defendant and inquired as to where he had obtained the purse. Danaher stated that defendant at first claimed he had found it in the garbage, and then claimed he took it from a nearby McDonald's restaurant. The detectives then arrested defendant and recovered three stolen credit cards from his pocket.

---

* Defendant also claimed to be wearing eyeliner, but it is not discernible in the arrest photograph, and the fact that he is wearing an earring and a ponytail is not necessarily feminine.

Defendant, on the other hand, testified that he took the unattended purse from the McDonald's not to steal its contents, but so that he would have a place to put his papers, and that he had put the credit cards into his pocket so that he could return them to their owner. Defendant, on the question of where he was when he put the credit cards into his pocket, inconsistently testified, on direct examination: that he placed the credit cards in his pocket "[w]ay before I got to 28th Street"; and, in contrast, that he placed them in his pocket in a phone booth on 28th Street. On cross examination, defendant stated, alternatively, that: he threw the credit cards away, he threw only some of them away, and kept all of them, either in the purse or in his pocket. Defendant, who at the time of his arrest had an outstanding parole warrant for his arrest, further testified that he was walking between 27th and 28th streets when he removed the cards from the bag, so at least one of defendant's versions of what transpired echoes Danaher's testimony insofar as the detective testified he observed defendant going through the purse between 27th and 28th streets. Defendant also acknowledged that he was with two acquaintances from a homeless shelter when approached by Danaher and his partner, which further reflects the scenario described by Danaher.

In view of the foregoing, we find it was error to credit the conflicting, often confused, and sometimes incredible testimony of defendant over that of Detective Danaher and further find that Danaher, from his vantage point, had an unobstructed view of defendant, a male in need of a shave, flanked by two other unidentified males, rifling through a woman's purse and placing something that looked like a credit card into his pocket. Given defendant's subsequent evasive and contradictory answers, we find the stop of defendant, and his subsequent arrest, to have been lawful. Concur—Tom, J.P., Friedman, Nardelli and Sweeny, JJ.