[851 NYS2d 40]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANDREW PACKER, Appellant.

First Department, January 29, 2008

## APPEARANCES OF COUNSEL

*Steven Banks, The Legal Aid Society*, New York City (*Ellen Dille* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Eric Rosen* and *Sheryl Feldman* of counsel), for respondent.

## OPINION OF THE COURT

LIPPMAN, P.J.

At the hearing upon defendant's suppression motion, the police witnesses gave an essentially uncontradicted account of the events leading to the discovery of a knife in defendant's backpack. Defendant had been a passenger in a car operated by an individual sought by the police for cashing forged checks. When the car was stopped by the police so that the arrest of the suspected check forger could be made, defendant attempted to leave the vehicle but was told by one of the officers assisting in the arrest, Officer Jones, to remain in the car and place his hands where they could be seen. A moment later, defendant was directed by Jones to step out of the car. He complied, and was immediately frisked. A small knife was recovered from one of his pockets. Jones then asked defendant for identification. Defendant responded that his identification was in his backpack, which he attempted to retrieve from the back seat of the car. Jones, however, stopped him, saying, "I will get the bag." Once Jones had the bag, he asked defendant if he could open it to look for defendant's identification. Defendant replied "yes." Jones unzipped the bag, and inside found the knife upon which defendant's conviction of attempted possession of a weapon is premised.

The motion court correctly found, and the People now commendably concede, that the frisk of defendant was illegal and, accordingly, that the knife found during the frisk must be suppressed. Suppression was, however, denied as to the knife found in the backpack upon the theory that defendant's consent to the backpack search was furnished in the context of a benign request for identification and was voluntary. This conclusion was erroneous as a matter of law.

It is a basic premise of the law of search and seizure that police-initiated intrusions must be justified at their inception

(*see Terry v Ohio*, 392 US 1, 19-20 [1968]; *People v Cantor*, 36 NY2d 106, 111 [1975]; *People v Moore*, 6 NY3d 496, 498 [2006]). The remedial corollary of this premise is that evidence acquired in consequence of police conduct initiated on an insufficient predicate, must be suppressed (*Terry* at 12; *Cantor* at 111; *Moore* at 498). While the effect of illegally initiated police intrusion may potentially become attenuated, as a practical matter there is rarely opportunity for the attenuation of primary official illegality in the context of brief, rapidly unfolding street or roadside encounters predicated on less than probable cause, and it is telling that the People cite no case from this jurisdiction in which such a claim of attenuation has been upheld.[1] Indeed, in this state, once a wrongful police-initiated intrusion is established, suppression of closely after-acquired evidence appears to follow ineluctably (*see e.g. People v Moore*, 6 NY3d at 498; *People v McIntosh*, 96 NY2d 521, 527 [2001]; *People v Banks*, 85 NY2d 558, 562 [1995], *cert denied* 516 US 868 [1995]; *People v Hollman*, 79 NY2d 181, 194 [1992]).

In seeking to avoid suppression of the latter-discovered knife, the People rely entirely upon the purported consent by defendant to the search of his backpack. This reliance is, of course, necessitated by the absence of any other predicate for the search. As noted, the People have conceded that the frisk was illegal, i.e., that it was premised on less than reasonable suspicion of criminal activity (*see People v De Bour*, 40 NY2d 210, 223 [1976]), which inadequacy is in any event affirmatively established by the police testimony at the suppression hearing;[2] and inasmuch as the predicate for police intrusion could not have been augmented by the illegal frisk, it is plain that, apart from defendant's consent, there exists no arguable justification for the closely ensuing backpack search.

---

1. Contrary to the dissent, we do not state that attenuation is "all but impossible" in these circumstances, only that the very narrow temporal window within which these encounters should occur (*see Florida v Royer*, 460 US 491, 500 [1983]) constitutes a significant practical limitation upon the utility of attenuation theory. Clearly, however, attenuation remains a potentially useful theory notwithstanding this limitation. Even during a brief encounter, a police officer may, for example, prior to requesting consent for a further intrusion, clearly advise an illegally detained civilian that the encounter has concluded and that he or she is free to leave or to refuse permission for the proposed intrusion. Such advice would at least create a factual issue as to the voluntariness of any ensuing consent.

2. This testimony contains the candid concession that at the time of the vehicle stop, the police "had no specific information on Mr. Packer."

It is the People's burden to establish the voluntariness of defendant's consent, and that burden is not easily carried, for a consent to search is not voluntary unless "it is a true act of the will, an unequivocal product of an essentially free and unconstrained choice. Voluntariness is incompatible with official coercion, actual or implicit, overt or subtle" (*People v Gonzalez*, 39 NY2d 122, 128 [1976]). Had the encounter culminating in defendant's consent been initiated by a simple request for identification, it is possible that the People would be able to demonstrate that the consent upon which they rely was freely given. The record, however, does not permit the conclusion that the encounter was in its true aspect so modest; rather, it included highly intrusive police conduct the coercive effect of which could not have abated when, only moments later, defendant consented to the search of his pack. Under these circumstances, no showing of voluntariness consonant with the exacting standard set forth in *Gonzalez* is possible; the People's burden under the facts at bar is not merely "heavy" (*id.*), it is insuperable.

Recognizing the inherent potential for intimidation and coercion in police initiated encounters (*see Hollman*, 79 NY2d at 191-192) and the daunting burden to which the People are put when the voluntariness of a defendant's consent is at issue (*see Gonzalez*, 39 NY2d at 128), this State's courts have categorically rejected prosecutorial reliance on consent to validate otherwise impermissible searches when consent was given in consequence of improperly initiated police inquiry or intrusion. Thus, in *Hollman*, the Court, after observing that the arresting officer "crossed the line . . . when he asked to search the defendant's bag," held that "[b]ecause the defendant's consent was a product of the improper police inquiry, the Appellate Division was in error when it found that the defendant had in fact consented to the search of his bag (*see, People v Gonzalez*, 39 NY2d 122, 128; *see also,* 3 LaFave, Search and Seizure § 8.2 [d] [2d ed])" (79 NY2d at 194; *accord People v Dunbar,* 5 NY3d 834, 835 [2005]; *People v McIntosh,* 96 NY2d at 527; *People v Turriago,* 219 AD2d 383, 387 [1996], *mod on other grounds* 90 NY2d 77 [1997]); and in *People v Banks* (85 NY2d at 563), the Court, after observing that "[t]he consent to search was obtained during or immediately after th[e] extended detention and without any intervening circumstances," held, relying on both *Hollman* and *Gonzalez*, that "under no rational view of the evidence at the suppression hearing can it be concluded that Jones' consent

was acquired by means sufficiently distinguishable from the taint of illegal detention." The common thread in these cases is that once improperly initiated police conduct is established, a directly ensuing consent to search will be deemed invalid as a matter of law.

That the issue of voluntariness is categorically overdetermined when it arises in the context of brief, improperly initiated police-civilian encounters is well demonstrated here. Although suspected of no crime, defendant was effectively seized when the vehicle in which he was a passenger was stopped (*Brendlin v California*, 551 US —, 127 S Ct 2400 [2007]).[3] That initial seizure was perpetuated when defendant was prevented from leaving the vehicle (*see People v Harrison*, 57 NY2d 470, 476 [1982]) and told to put his hands where they could be seen, and, of course, continued when defendant was ordered out of the vehicle and frisked (*see Turriago*, 219 AD2d at 390). Nothing that occurred in the very brief interval between the knife-yielding frisk and the purported consent can reasonably be understood as indicating that defendant was then free to go about his business and exercise ordinary prerogatives as to his person and property (*see Kaupp v Texas*, 538 US 626, 629 [2003]). To the contrary, he was prevented from retrieving his backpack and, as a practical matter, concomitantly prevented from terminating his encounter with Jones. It was, then, in an essentially custodial context uninterrupted since the seizure of the vehicle, and not in the benign, artificially segmented context posited by the motion court and now by the People and the dissent, that Jones proposed to search defendant's pack. It is simply untenable, given the persistence of defendant's detention and the nature of the illegal intrusion to which he was subject only a moment before his purported consent, to conclude that the People met their burden to show that defendant's consent was not the product even of "implicit" or "subtle" coercion. Indeed, the coercive logic of the situation would have been obvious to any reasonable, innocent person in defendant's

---

**3.** While it is true that the initial seizure of defendant as an immediate and unavoidable consequence of the legal stop of the vehicle in which he was a passenger was proper, as was Officer Jones's direction that he exit the vehicle (*see People v Robinson*, 74 NY2d 773, 774-775 [1989], *cert denied* 493 US 966 [1989], the "[b]rief and uniform precautionary procedures" authorized under *Robinson* (at 775) were thereupon exhausted, and the further detention of defendant was not permissible, except upon reasonable suspicion of his commission of a crime (*see People v Moore*, 6 NY3d at 498), which the police admittedly did not have.

place (*see Matter of Kwok T.*, 43 NY2d 213, 219-220 [1977]). Having just been summarily seized and frisked by Jones, defendant could have had no reason to suppose that withholding consent to another similar intrusion a moment later would be efficacious. A reasonable person in defendant's situation unadvised as to his or her actual legal prerogatives could not have been expected to entertain the seemingly improbable and certainly counterintuitive hypothesis that Jones now required permission to do what he had, under the apparent authority of the badge, done without permission only a moment earlier.

The necessity of rejecting the People's claim of voluntariness in this situation is not at all diminished by the circumstance that defendant was not more aggressively detained. Contrary to the People's contention, the conclusion that defendant was illegally seized for Fourth Amendment purposes during his encounter with Jones is not rendered less compelling by the fact that he was not at the time of his consent formally arrested and placed in handcuffs. Nor, given the conceded directly antecedent illegality and the unjustified continued detention of defendant, can it avail the People that Officer Jones's request for identification was unobjectionable or that his request to search defendant's backpack might otherwise have elicited a consent that it would be possible to characterize as voluntary. The salient and dispositive circumstance under *Hollman* and *Banks* is that defendant's consent was contemporaneous with, or at the very least immediately followed, his subjection to an illegal frisk and detention.

The dissent is evidently premised upon the notion that defendant was seized only during the frisk and that, the instant the frisk concluded, a reasonable person in defendant's position would have felt free to go about his or her business. The law, however, does not permit us simply to assume that the effect of primary illegality will ipso facto dissipate. Rather, it presumes that primary illegality will infect the ensuing investigative sequence and, accordingly, requires the prosecution to demonstrate attenuation if the taint is to be contained (*see Gonzalez*, 39 NY2d at 128; *and see People v Borges*, 69 NY2d 1031 [1987]). The sole attenuative circumstance urged by the dissent is that, after the frisk, defendant was not arrested and placed in handcuffs. It is not explained, however, how this forbearance from even more pronounced illegal intrusion would have communicated to defendant that, notwithstanding the just concluded frisk, he was no longer subject to the authority of the officers

who had in the preceding moments blockaded the car in which he was a passenger, prevented him from exiting the vehicle, and then directed him out of the vehicle, where he was summarily frisked. It will nearly always be possible to hypothesize some greater level of intrusion to which a defendant might be submitted. Attenuation, however, does not lie in an imagined differential, but in an appreciable diminution of the coercive sequelae of prior illegality. Here there was none. Immediately following the frisk, Officer Jones prevented defendant from retrieving his backpack, took possession of it himself and then requested to look inside of it. He admitted in his testimony that defendant was not free to go, and certainly there is no evidence that during the encounter he communicated a contrary impression. Although not under arrest, defendant was certainly in custody at the time his consent was elicited. Under these circumstances, the People were unable to show that defendant's consent was voluntary (*see Gonzalez*, 39 NY2d at 128), much less that it was acquired by means sufficiently distinguishable from the illegality to be purged of its taint (*see Borges*, 69 NY2d at 1033).

Accordingly, the judgment of the Supreme Court, New York County (Robert H. Straus, J., at suppression hearing; Ruth Pickholz, J., at plea and sentence), rendered April 20, 2006, convicting defendant of attempted criminal possession of a weapon in the third degree, and sentencing him, as a second felony offender, to a term of 1½ to 3 years, should be reversed, on the law, the suppression motion granted, and the indictment dismissed.

MALONE, J. (dissenting). Two police officers went to McLane Security, a business located on 36th Street in Manhattan, to arrest Leslie Gabriel, an employee who was suspected of cashing counterfeit checks drawn on McLane Security's account. Although they were expecting Gabriel to pick up his paycheck there, defendant appeared in his stead, while, as the officers later discovered, Gabriel waited in his car parked in front of the building. The receptionist refused to give defendant the check and told him that Gabriel would have to pick it up himself. After filling out a job application, defendant left the office and joined Gabriel in the car.

In my view, when taking into account the totality of the circumstances confronting the police on the date in question, especially the events leading to defendant's initial contact with the

police, which the majority does not recite, the conduct of the police in asking defendant to present identification was reasonable and justified and defendant's consent to search his backpack for his identification was voluntary, so that the recovery of the knife from the backpack was lawful. Accordingly, I would affirm the judgment.

Any inquiry into the propriety of police conduct must begin with a weighing of the degree of intrusion entailed against the precipitating and attending circumstances out of which the encounter arose (*People v Salaman*, 71 NY2d 869, 870 [1988]; *People v De Bour*, 40 NY2d 210, 223 [1976]). "[T]he 'crucial factor' in evaluating street encounters between a police officer and a civilian is whether the officer acted reasonably under all the circumstances" (*People v Grunwald*, 29 AD3d 33, 37 [2006], *lv denied* 6 NY3d 848 [2006], quoting *De Bour*, 40 NY2d at 217). However, by limiting its analysis and beginning at the time defendant was frisked, the majority's reasoning that the second knife was procured illegally is flawed (*see People v Lomiller*, 30 AD3d 276, 277 [2006], *lv dismissed* 7 NY3d 850 [2006] ["court's focus must concentrate on whether the conduct of the police was reasonable at the time in view of the totality of the circumstances"]).

As properly found by the suppression court, defendant's conduct in attempting to pick up Gabriel's check and then getting into Gabriel's car gave the police "an objective, credible reason, not necessarily indicative of criminality" to request identification from defendant (*People v Hollman*, 79 NY2d 181, 184 [1992] citing *De Bour*, 40 NY2d at 223). Indeed, on this set of facts, where defendant was stopped legally, in a parked car, with an individual wanted by the police, after he had just sought to obtain the other individual's check from his employer so that the individual would not have to enter the employer's premises, it is my view that the police were provided with a "founded suspicion that criminal activity [was] afoot," which, in turn, activated "a common-law right to inquire" (*De Bour* at 223; *see also Grunwald*, 29 AD3d at 37).

The majority's position is that everything following the initial seizure, which the People concede was illegal, including the officer's request for identification, was tainted by that initial seizure. I cannot agree. Upon the conclusion of that brief frisk, defendant's "momentary seizure" ended, and the consensual nature of the remainder of the encounter was restored (*United States v Davis*, 202 F3d 1060, 1062 [8th Cir 2000], *cert denied*

531 US 883 [2000]). The majority places too much emphasis on the brevity of the interval between the frisk and the request for identification, which is but one of several factors to consider in determining whether the taint of an illegal frisk has been sufficiently purged or attenuated. Indeed, a "discrete analysis of each factor . . . is inappropriate as the [police] are confronted with only a complete set of circumstances" (*People v Anderson*, 17 AD3d 166, 167 [2005]). In the same vein, given the realities of risk that the police face in these types of situations, I am reluctant to sign onto the majority's seemingly blanket pronouncement that once a wrongful police initiated intrusion is established, attenuation is all but impossible within "the context of brief, rapidly unfolding street or roadside encounters." Taking into account the totality of the instant circumstances confronting the police, I find more significant than the time element emphasized by the majority that here, after the frisk that produced the first knife, defendant was neither arrested nor handcuffed or otherwise physically detained (*compare People v Bora*, 83 NY2d 531, 535-536 [1994]). Other factors recited in *Bora*, such as whether defendant was prevented from moving, how many verbal commands were given, and the content and tone of the commands, cannot be fleshed out from the record before us. However, to the extent that the court credited the officer's testimony that he had not decided whether to arrest defendant before turning over the knives to the other officer and that he requested permission to look through the bag only to obtain identification, the findings of fact of the hearing court, which had the peculiar advantages of having seen and heard the officer, are entitled to great deference on appeal and should not be disturbed (*People v Prochilo*, 41 NY2d 759, 761 [1977]).

Clearly, had the officer, when confronted with the first knife, arrested defendant, the second knife would have had to be suppressed. However, by asking defendant for identification instead, the effect of the illegal frisk became sufficiently attenuated that a reasonable person would not have believed that defendant remained "seized" after the frisk ended.* Since the officer's request for identification did not significantly interrupt

---

* Contrary to defendant's argument, he was not in police custody from the moment the police blocked Gabriel's car. Whether the police asked defendant, as the passenger, to step out of the vehicle or directed him to remain inside the car, such requests are de minimis intrusions on the privacy interests protected by the Fourth Amendment (*see People v Robinson*, 74 NY2d 773, 774 [1989], *cert denied* 493 US 966 [1989]; *People v Alvarez*, 308 AD2d 184, 187

defendant's "liberty of movement," even under New York law, defendant did not remain under seizure, under the reasonable person standard recited in *Bora* (83 NY2d at 534; *see also People v Hicks*, 68 NY2d 234, 240 [1986]).

Further, the officer's search of the backpack was completely reasonable. In response to the request for identification, defendant told the officer that it was in his backpack, which was located in the back seat of the parked car. Defendant then moved toward the back door of the car to get the backpack, but the officer grabbed the backpack himself, placed it on the trunk of the car, and asked defendant if the identification was inside the bag. Defendant told him that it was, and the officer asked him if he could open the bag to find the identification. After obtaining defendant's permission, the officer opened the front pocket area of the backpack and, along with the identification, found the second knife. Under these circumstances, it certainly was reasonable for the officer to retrieve the backpack from the car and completely unreasonable and unfair to expect the officer to allow defendant himself to get into the bag, when it could have contained any number of objects that might threaten the officer's safety. Moreover, since the search of the backpack was limited to retrieving the identification, and, indeed, only the front pocket area of the backpack was searched, the search was not overly intrusive; nor was it an invasion of defendant's privacy.

The People's burden to establish the voluntariness of defendant's consent was sufficiently satisfied (*see People v Gonzalez*, 39 NY2d 122, 127 [1976]; *see generally People v Thiam*, 232 AD2d 199, 199 [1996], *lv denied* 89 NY2d 930 [1996]). The term "voluntary" "implies freedom and spontaneity of choice or action without external compulsion" (Merriam-Webster's Collegiate Dictionary 1402 [11th ed 2003]). Absent here was any objective evidence of an "external compulsion," since after the first knife was recovered from defendant's person, he was not placed in custody or otherwise stripped of his freedom of movement or subjected to any "overbearing official conduct" (*Gonzalez*, 39 NY2d at 124). Indeed, defendant's consent in allowing the officer to open his backpack was simply a response to a nonthreatening, and entirely appropriate, request for identification. Defendant's status as a parolee, which he argues "undermined the conclusion that his consent was the

[2003], *lv denied* 3 NY3d 657 [2004]; *People v Forbes*, 283 AD2d 92 [2001], *lv denied* 97 NY2d 681 [2001]).

product of his free and unconstrained choice," in fact adds to the reasonable belief that, given his experience with the police, his consent was voluntary (*see id.* at 129). Having seen that only his friend, not he, was being handcuffed, a reasonable person in defendant's position would have realized that he was not in police custody.

Since the recovery of the second knife was not the product of the unlawful frisk, but rather the product of the request for identification, and thus sufficiently distinguishable from the frisk, I would find that defendant's motion to suppress the second knife was properly denied.

TOM and GONZALEZ, JJ., concur with LIPPMAN, P.J.; MARLOW and MALONE, JJ., dissent in a separate opinion by MALONE, J.

Judgment, Supreme Court, New York County, rendered April 20, 2006, reversed, on the law, the suppression motion granted, and the indictment dismissed.