Catterson, J.,
dissents in a memorandum as follows: Because the Penal Law definition of a gravity knife precludes any possibility of identifying such a knife by simply looking at it, much less by viewing just the metal clip to which it is attached, I must respectfully dissent. Penal Law § 265.00 (5) defines a gravity knife as any knife with “a blade which is released from the handle ... by the force of gravity [and] which, when released, is locked in place.” Thus, it is beyond cavil that the only way to distinguish an illegal gravity knife from a legal folding knife is by testing such a knife as to its dual-action operation. Neither training nor experience can provide a police officer with the ability to distinguish a gravity knife from a regular folding knife just by looking at it while it is partly concealed in someone’s pocket. Indeed, in this case, the detective and arresting officer, Antonio Benero, Jr., acknowledged in testimony that a curved metal clip like the one he saw on the outside of defendant’s back pocket is also attached to legal pocket knives. Consequently, without more, the detective did not have probable cause for the level-four intrusion of a full-blown search and seizure, nor even reasonable suspicion for a forcible stop. (See People v De Bour, 40 NY2d 210 [1976]; see also People v Cantor, 36 NY2d 106 [1975].)
The defendant was charged with criminal possession of a weapon in the fourth degree (Penal Law § 265.02 [1]) and unlawful possession of a knife (Administrative Code of City of NY § 10-133 [b]). He subsequently sought to suppress the evidence seized from him, as well as any statements made to the police at the time of his arrest. On March 27 and 28, 2008, a combined Mapp/Dunaway hearing was held, at the conclusion of which the hearing court suppressed the knife seized, as well as the statements made by the defendant.
*897 At the hearing, Detective Benero testified to the events leading up to the defendant’s arrest. He stated that on March 11, 2007, he and his partner were assigned to the Bronx Gang Unit and were on patrol in an unmarked police vehicle. He testified that, at approximately 11:30 p.m., they “slowed down for a pedestrian that intentionally slowed down as he walked in front of [the] vehicle . . . just basically, you know, trying to control the traffic.”
His testimony on direct proceeded as follows:
“Q: [W]hen you saw the defendant cross in front of your vehicle what did you see[?]
“A: I drove passed [sic] him. I was looking basically at his right side of his body. And I observed what appeared to be like a knife clipped to the rear jeans’ pocket . . .
“Q: How did you know it was a knife . . . ?
“A: Based on my experience handling knives and after many arrests I just recognized it being either a knife, or it could have also been a small caliber weapon, also like handguns, too, they have those clips also. So—I pretty much was leaning towards the knife.
“Q: And what did you do at this point. . . ?
“A: I stopped the vehicle. I walked up behind him and asked him to stop and then I just grabbed, went for the knife, and pulled it out of his pocket.”
Subsequent testimony established that the defendant did not make any furtive movements or threatening gestures toward either Detective Benero or his partner, nor did he reach for the knife or conceal it. The defendant did not exhibit any suspicious or disturbing behavior, other than walking slowly in front of the unmarked patrol car. His hands were not in his pockets. He was not running. Nor was this a case where a defendant was reaching for an object believed to be a weapon when the detective “just grabbed” the knife out of his pocket. He had not brandished the knife, or taken it out of his pocket at any time, or “flicked” it to expose a blade.
The detective did not question or frisk the defendant before “grabbing” for the object in the defendant’s pocket. It was only once the knife was in his hands that he discovered that it could be opened by “flick[ing] it” with “a side move with [his] hand,” confirming it was a gravity knife. At that point, the detective placed the defendant under arrest. The detective testified that he had taken the knife as a preventive act because he feared for his safety, as he could not ascertain whether the object was a knife or a handgun.
*898 In moving to suppress, the defendant argued that the detective had, at best, a basis to inquire, i.e., a level-two stop, in accordance with De Bour (40 NY2d at 223). The defendant contends that the detective did not have reasonable suspicion to warrant a level-three seizure, or probable cause for arrest and a full-blown search, because the metal clip he observed could have been attached to any number of innocuous objects.
The court agreed that, at most, the police had a level-two common-law right to inquire pursuant to De Bour. The court found that the detective grabbed the knife from the defendant’s pocket before he could determine with certainty that the object was, in fact, a dangerous weapon, and thus that he did not have the requisite reasonable suspicion of criminality warranting third- or fourth-level stop and seizure. The court suggested that, even accepting the testimony that the detective feared for his safety, he could have patted down or frisked the defendant first, instead of reaching for his pocket and removing the knife. The court therefore granted the defendant’s motion to suppress both the knife and the statement.
On appeal, the People argue that the evidence presented at the hearing shows the detective had reasonable suspicion to stop the defendant. The People argue that it was sufficient that the detective saw the distinctive shape of the gravity knife in the defendant’s pocket, and that, based on his 18 years of experience as a police officer, he took reasonable measures in preserving his safety.
In my opinion, the court properly granted the motion to suppress both the physical evidence of the gravity knife and the statement made to the police. It is well established that, for a lawful seizure, an officer must have a reasonable suspicion that an individual is committing a crime. (People v De Bour, 40 NY2d at 223.) In De Bour, the Court of Appeals established the standard for evaluating police-initiated encounters with citizens by dividing these encounters into four levels of intrusion. The first, and least intrusive, level is described as a request for information “when there is some objective credible reason for that interference not necessarily indicative of criminality.” (Id.) The second level, the “common-law right to inquire, is activated by a founded suspicion that criminal activity is afoot,” and while permitting “a somewhat greater intrusion” to gain information, falls “short of a forcible seizure.” (Id.) Only where a police officer has “reasonable” suspicion that a particular person has committed or is about to commit a crime is the officer authorized to make a level-three forcible stop and detention. (Id.) This level brings with the right “to temporarily detain for *899 questioning . . . the authority to frisk if the officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed.” (Id.) The fourth level of intrusion is an arrest when there is probable cause to believe a person has committed a crime. (Id.)
As a threshold matter, and contrary to the majority’s view that this was a level-three encounter requiring reasonable suspicion, I would find that the police conduct in this case rose to a level-four encounter requiring probable cause. (See People v Cobb, 208 AD2d 453, 453 [1994], citing People v Diaz, 81 NY2d 106, 109 [1993], and People v Soto, 194 AD2d 371 [1993].) In Cobb, this Court determined, upon reviewing circumstances virtually identical to those in the instant case, that police officers who suspected a defendant was selling credit cards and conducted “a search of defendant’s pocket without any inquiry” had essentially effected what “amounted to an arrest requiring probable cause.” (Cobb at 453.) Even were I to agree with the majority that the encounter was a level-three forcible stop, in my view, the detective had no basis, that is, he had no reasonable suspicion, for making such a stop. He testified that, based on his training and experience (including 50 to 100 arrests made for possession of weapons such as gravity knives), he knew that gravity knives “often” had the same type of metal clip as was showing at the top of the defendant’s pocket; and that “the way the clip is designed and curved those are most, they are typical of clips that are, you know, basically part of knives.” However, he was obliged to acknowledge that, “[u]ntil I pulled it out of the pockety whether it was a gun or knife, I wasn’t sure.”
The detective’s equivocation apparently does not concern the majority, possibly because, as the majority holds, based on the sight of the metal clip “he believed the object in question to be an illegal weapon.” However, his belief that it was either a small-caliber handgun or a knife cannot translate into a reasonable suspicion, nor even a founded suspicion, that the object was an illegal weapon. To find such a belief constitutes reasonable suspicion would be to ignore the simple fact that the Penal Law does not criminalize the possession of all knives. (See Penal Law § 265.01 [1]; see also People v Jose E, 60 AD2d 918, 919 [1978] [defendant “was simply carrying (a) knife, and a knife is not a weapon per se”]; Matter of Ricci S., 34 NY2d 775, 776 [1974] [“An unmodified hunting knife with a five- to six-inch blade cannot be said to be a dangerous knife within the meaning of (section 265.05)”]; People v Irizarry, 17 Misc 3d 1118[A], 2007 NY Slip Op 52051[U], *3 [2007] [“There are many legitimate reasons for a person to carry a small pocket knife and *900 numerous citizens legally do so in the course of their occupations”].)
Indeed, the detective himself acknowledged that metal clips are often attached to legal knives, as the following demonstrates:
“Q: Detective, it is true that there are many objects that have metal clips; is that correct?
“A: That is correct. . .
“Q: There are tape measure clips that are also metal; yes?
“A: That is correct.
“Q: And there are actually also many legal pocket knives that have metal clips?
“A: Legal pocket knives?
“Q: Yes.
“A: That’s correct.”
Setting aside his apparent surprise that possession of some knives is not criminal per se, the detective essentially acknowledged that the metal clip could equally well have been attached to a legal knife. Indeed, he then testified that he did not discover it was a gravity knife after grabbing it out of the defendant’s pocket, but only after he actually opened it and tested it to ascertain that it was an illegal gravity knife. “I basically took it out and flicked it and it opened up. I have a side move with my hand and I flicked it and it opened up.”
More significantly, the detective could not point to any specific, articulable facts that would support a reasonable suspicion prior to seizure that the knife was an illegal gravity knife: There is no evidence in this record (or in any case involving gravity knives) that a gravity knife can be identified by being a particular brand of knife or one of a number of brands of gravity knives sold in stores. Indeed, in no case before this Court has a police witness testified to identifying a gravity knife based on any visible, identifying characteristics peculiar to gravity knives. For example, in People v Mendez (68 AD3d 662 [1st Dept 2009]), we granted suppression and quashed the indictment because the observation by a police officer of a knife in the defendant’s possession did not support a finding of reasonable suspicion of criminality. The officer testified that he based his suspicion that the knife was a gravity knife on the fact that “any folding knife could, upon inspection, turn out to be a gravity knife.” (Id. at 662.)
The majority, I believe, misses the point when it attempts to distinguish this result by focusing on the police officer’s testimony that he “did not see any characteristics of an illegal *901 type of knife” (id.) as if it was the police officer’s failure of observation or his lack of experience that accounted for missing the defining characteristics of a gravity knife on sight. The relevant point that emerged from the truthful testimony is that a gravity knife can only be recognized “upon inspection” and not through any distinguishable identifying characteristics, even were the arresting officer endowed with the proverbial X-ray vision.
Abundant case law from criminal courts (which regularly deal with suppression motions like the one at issue on this appeal) supports the view that because a police officer cannot ascertain whether a knife is an illegal one just by looking at it or even holding it, there is no “quantum of knowledge” that could give rise to reasonable suspicion, or even a founded suspicion, that what appears to be a knife in a defendant’s possession is in fact an illegal gravity knife. In other words, suppression courts have taken the view that there is no evidence that can be presented as to visible differentiating characteristics that would support a reasonable belief or suspicion as to the illegality of the knife, and thus seizure cannot be warranted in those cases. (See People v Francis, 17 Misc 3d 870 [Sup Ct, Bronx County 2007] [where officer observed only a portion of a knife clip, inquiry may have been warranted but not seizure]; People v Sosa, 20 Misc 3d 1140[A], 2008 NY Slip Op 51805[U] [Nassau Dist Ct 2008] [observation of clip and outline of folding knife did not justify search and seizure]; People v Irizarry, 17 Misc 3d 1118[A], 2007 NY Slip Op 52051[U], *3 [2007], supra [“no testimony elicited (as to) anything in the knife’s physical appearance ... to differentiate it from a legal pocket knife . . . Therefore, prior to . . . conducting the physical test on the knife, there was no evidence to support a reasonable belief the knife was a gravity knife”]; People v Higginson, 24 Misc 3d 1217[A], 2009 NY Slip Op 51478[U], *3 [Crim Ct, NY County 2009] [“deponent determined that said knife was a gravity knife because deponent opened the knife with centrifugal force by flicking his wrist while holding the knife and the blade locked in the open position”].)
In United States v Irizarry (509 F Supp 2d 198 [ED NY 2007]), the court concluded that the officer who arrested the defendant for carrying a Home Depot utility knife that he used for his work did not have reasonable suspicion of criminal activity. The court observed that “[t]he widespread and lawful presence of an item in society undercuts the reasonableness of an officer’s belief that it represents contraband.” (Irizarry at 209, citing United States v Romy, 1997 WL 1048901, *8 [ED NY 1997] *902 [while recognizing cell phones as tools of drug trade, court rejected argument that possession of cell phones established either probable cause or reasonable suspicion , that defendant had engaged in criminal activity]; see also People v Cantor, 36 NY2d 106 [1975], supra [officers made unlawful forcible stop after viewing defendant from across street smoking a cigarette, which they believed contained marijuana]; see also People v Grunwald, 29 AD3d 33 [2006].) In Grunwald, this Court affirmed a finding that police officers seeing defendant with a hand-rolled, filter-less cigarette, holding it like a “joint,” only had a first-level right to request information in their initial encounter and lacked the reasonable suspicion of criminal activity that would justify a forcible stop.
The People’s, and the majority’s, reliance on People v Carter (49 AD3d 377 [1st Dept 2008], lv denied 10 NY3d 860 [2008]), People v Snovitch (56 AD3d 328 [1st Dept 2008], lv denied 11 NY3d 930 [2009]) and People v Fernandez (60 AD3d 549 [1st Dept 2009]) is misplaced. These are two-paragraph decisions in three cases where gravity knives were recovered from defendants. The decisions are bereft of any factual or legal analysis, and thus, in my opinion, lack precedential value. Certainly, I would hesitate to cite any of the three cases as standing for the proposition that reasonable suspicion in gravity knife cases may be based solely on the arresting officer’s “experience,” or even “extensive experience.” In Fernandez, the police officer did acknowledge that a gravity knife cannot be determined as such without testing. Fernandez at 549 (testimony that the top of a shiny metal knife attached with a clip to the defendant’s pants pocket was “likely to be a gravity knife, even if the knife’s illegal status cannot be determined without testing it”). There is no explanation of how the officer’s experience led him to believe that the particular knife in question was “likely” to be a gravity knife. In Snovitch, this Court did not analyze the lawfulness of the initial stop but appeared to equate it with a request for information in a first-level encounter pursuant to De Bour (40 NY2d at 223), finding that “the officer merely approached defendant, identified himself as a police officer, and told defendant that he was stopping her because of the knife in her pocket.” (Snovitch at 329.) The Court then determined that the officer was justified in removing the knife “after defendant’s hand moved toward the knife” and the officer became concerned for his safety. (Id.) In Carter, there is no information at all beyond the sentence that “the officer saw what appeared, based on his experience, to be an illegal gravity knife clipped to defendant’s clothing, and that he did not merely see a clip.” (49 AD3d at 377.)
*903 It should be evident from the foregoing that a police officer’s testimony as to identifying an illegal gravity knife from a distance based on his “training and experience” can be nothing more than the “rote recital of the words deemed necessary to retroactively validate a patently improper search.” (People v Howard, 147 AD2d 177, 182 [1st Dept 1989].) The foregoing phrase is borrowed from People v Howard, in which this Court applied it to unsupported conclusory statements made by police officers at a hearing that they were afraid for their lives. They appear particularly appropriate applied to the many cases where police officers have offered conclusory statements that their training and experience is a basis for recognizing otherwise unidentifiable gravity knives.
In my opinion, the testimony of the detective in this case supports a finding that he acted only on an assumption when he seized the defendant and grabbed the item from his pocket: not only did he act on the assumption that the object was a knife, but he operated under the further assumption that such knife was an illegal gravity knife. An assumption is an impermissible basis for any encounter above a level-one request for information. (See People v De Bour, 40 NY2d at 223; People v Paveras, 155 AD2d 131, 135 [1st Dept 1990] [“a vague or unparticularized hunch” does not amount to a reasonable suspicion].) Since, in my opinion, the illegal gravity knife and statements were obtained as a result of an unlawful seizure, I would affirm Supreme Court in suppression of both the knife and the defendant’s statements. [Prior Case History: 19 Misc 3d 1140(A), 2008 NY Slip Op 51077(11).]